**No. 26-30179**

# UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

MICHAEL DESELLE; REBECCA GUIDRY; STELLARISING, LLC; EPH320, LLC,

*Plaintiffs-Appellants*,

v.

LAFAYETTE CITY-PARISH CONSOLIDATED GOVERNMENT,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Western District of Louisiana,
No. 25-cv-00835

# BRIEF FOR PLAINTIFFS-APPELLANTS

PAUL D. CLEMENT
*Counsel of Record*
ANDREW C. LAWRENCE
MITCHELL K. PALLAKI
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Plaintiffs-Appellants*

June 24, 2026

## CERTIFICATE OF INTERESTED PERSONS

No. 26-30179, *Michael DeSelle; Rebecca Guidry; Stellarising, LLC; EPH320, LLC v. Lafayette City-Parish Consolidated Government*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1. Plaintiffs-Appellants:

Michael DeSelle; Rebecca Guidry; Stellarising, LLC; EPH320, LLC.

Stellarising, LLC, is a Louisiana Limited Liability Company with neither a parent corporation nor a publicly held corporation that owns ten percent (10%) or more of its membership interests.

EPH320, LLC, is a Louisiana Limited Liability Company with neither a parent corporation nor a publicly held corporation that owns ten percent (10%) or more of its membership interests.

2. Defendant-Appellee:

Lafayette City-Parish Consolidated Government.

3. Counsel for Plaintiffs-Appellants:

Mark A. Cunningham; Madeline Melissa Freese/Jones Walker, LLP;

Paul D. Clement; Andrew C. Lawrence; Mitchell K. Pallaki/Clement & Murphy, PLLC.

4. Counsel for Defendant-Appellee:

Chloe Marie Chetta; Judy Y. Barrasso; Lance William Waters; Lorcan L. Connick/Barrasso Usdin Kupperman Freeman & Sarver, L.L.C.

s/Paul D. Clement
Paul D. Clement
*Counsel of Record*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants request oral argument and believe that it would assist the Court in addressing the significant constitutional issues presented in this appeal.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF AUTHORITIES ............................................................................ vi

INTRODUCTION ............................................................................................ 1

JURISDICTIONAL STATEMENT ................................................................... 4

STATEMENT OF THE ISSUES ....................................................................... 5

STATEMENT OF THE CASE ........................................................................... 5

A. The Right to Lease and the Right to Exclude/Include ......................... 5

B. Legal Background ..................................................................................... 9

C. Factual and Procedural Background .................................................. 14

SUMMARY OF ARGUMENT .......................................................................... 20

STANDARD OF REVIEW ................................................................................ 24

ARGUMENT .................................................................................................... 24

I. Lafayette's Short-Term Rental Ordinance Violates The Takings Clause ........................................................................................................ 24

A. The Ordinance's Prohibition on Short-Term Rentals Effects *Per Se* Takings ............................................................................................. 25

B. The Ordinance's Prohibition on Short-Term Rentals Effects Regulatory Takings ................................................................................ 38

II. The Short-Term Rental Ordinance Violates The Equal Protection Clause ........................................................................................................ 46

III. Plaintiffs DeSelle And Guidry Are Proper Parties To This Action .............. 53

CONCLUSION ................................................................................................ 55

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Advanced Magnetics v. Bayfront Partners*,
106 F.3d 11 (2d Cir. 1997) .......... 54

*Alamo Land & Cattle Co. v. Arizona*,
424 U.S. 295 (1976) .......... 28, 49

*Alexander v. Harris*,
8 U.S. (4 Cranch) 299 (1808) .......... 27

*Alford v. Walton Cnty.*,
159 F.4th 844 (11th Cir. 2025) .......... 25, 34, 35

*Allegheny Pittsburgh Coal Co. v. Cnty. Comm'n*,
488 U.S. 336 (1989) .......... 52

*Armstrong v. United States*,
364 U.S. 40 (1960) .......... 35

*Att'y Gen. v. Soto-Lopez*,
476 U.S. 898 (1986) .......... 4, 47, 49, 50

*Barrere v. Shuber*,
5 La.App. 67 (La. Ct. App. 1926) .......... 7, 27

*Blakelick Props. v. Vill. of Glen Ellyn*,
2025 WL 3763905 (N.D. Ill. Dec. 30, 2025) .......... 42

*Breaker v. United States*,
977 F.Supp.2d 921 (D. Minn. 2013) .......... 54

*Butler v. Jones*,
21 So.2d 181 (La. Ct. App. 1945) .......... 7

*Cal. Democratic Party v. Jones*,
530 U.S. 567 (2000) .......... 31

*Casitas Mun. Water Dist. v. United States*,
543 F.3d 1276 (Fed. Cir. 2008) .......... 30

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021)........................................................................*passim*

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003)..................................................... 32, 34, 45, 46

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985)..........................................................................52

*Colony Cove Props. v. City of Carson*,
888 F.3d 445 (9th Cir. 2018).................................................................41

*Curley v. Dean*,
4 Conn. 259 (1822) ..............................................................................7

*Curtin v. Benson*,
222 U.S. 78 (1911)........................................................................ 25, 29, 35

*Dist. Intown Props. Ltd. P'ship v. District of Columbia*,
198 F.3d 874 (D.C. Cir. 1999) ...............................................................40

*Dolan v. City of Tigard*,
512 U.S. 374 (1994)...................................................................... 9, 31, 37, 49

*Ensley v. Cody Res.*,
171 F.3d 315 (5th Cir. 1999)..................................................................53

*Faretta v. California*,
422 U.S. 806 (1975)..........................................................................31

*Faw v. Marsteller*,
6 U.S. (2 Cranch) 10 (1804) ...............................................................6, 27

*Forshee v. Neuschwander*,
914 N.W.2d 643 (Wis. 2018) ................................................................44

*Hawkeye Commodity Promotions v. Vilsack*,
486 F.3d 430 (8th Cir. 2007)..................................................................41

*Hearts Bluff Game Ranch v. United States*,
669 F.3d 1326 (Fed. Cir. 2012)...............................................................29

*Heights Apartments v. Walz*,
30 F.4th 720 (8th Cir. 2022) .......... 40, 42

*Herbert v. Wren*,
11 U.S. (7 Cranch) 370 (1813) .......... 7

*Hignell-Stark v. City of New Orleans*,
154 F.4th 345 (5th Cir. 2025) .......... *passim*

*Hodel v. Irving*,
481 U.S. 704 (1987) .......... 33, 34, 42

*Horne v. USDA*,
576 U.S. 350 (2015) .......... 32

*Horton v. Handvil*,
3 A. 72 (N.J. Ch. 1886) .......... 7, 27

*In re Nat'l Sugar Refin. Co.*,
23 B.R. 726 (Bankr. S.D.N.Y. 1982) .......... 54

*INS v. Chadha*,
462 U.S. 919 (1983) .......... 54

*Jackson ex dem. Russell v. Rowland*,
6 Wend. 666 (N.Y. Sup. Ct. 1831) .......... 7

*Kaiser Aetna v. United States*,
444 U.S. 164 (1979) .......... 49

*Kohl v. United States*,
91 U.S. 367 (1875) .......... 28

*Lingle v. Chevron U.S.A.*,
544 U.S. 528 (2005) .......... *passim*

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) .......... 53

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) .......... 32

*Lowden v. Bosley*,
909 A.2d 261 (Md. 2006)....................................................................44

*Marfil v. City of New Braunfels*,
2026 WL1755753 (5th Cir. June 18, 2026)............................................*passim*

*Morin v. Moore*,
309 F.3d 316 (5th Cir. 2002)..............................................................24

*Muller v. Reynolds*,
26 So.2d 498 (La. Ct. App. 1946)..........................................................7

*Murr v. Wisconsin*,
582 U.S. 383 (2017).................................................................... 41, 46

*NYSRPA v. Bruen*,
597 U.S. 1 (2022).................................................................... 4, 49, 55

*Pandharipande v. FSD Corp.*,
679 S.W.3d 610 (Tenn. 2023) ........................................................ 22, 44

*Pelletreau v. Jackson ex dem. Varick*,
11 Wend. 110 (N.Y. Sup. Ct. 1833).........................................................6

*Penn Central Transp. Co. v. City of New York*,
438 U.S. 104 (1978).................................................................. 3, 21, 22

*Philip Morris, Inc. v. Reilly*,
312 F.3d 24 (1st Cir. 2002) ....................................................................35

*Pinehaven Plan. Bd. v. Brooks*,
70 P.3d 664 (Idaho 2003).......................................................................44

*Plyler v. Doe*,
457 U.S. 202 (1982).................................................................... 47, 49

*Pumpelly v. Green Bay Co.*,
80 U.S. (13 Wall.) 166 (1871)................................................................36

*Raymond v. Strickland*,
52 S.E. 619 (Ga. 1905) ............................................................................7

*Reeves v. Dougherty*,
15 Tenn. (7 Yer.) 222 (1834) .......... 7

*Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*,
561 F.2d 1327 (9th Cir. 1977) .......... 36

*Riley v. Nat'l Fed'n of the Blind*,
487 U.S. 781 (1988) .......... 31

*Rock v. Arkansas*,
483 U.S. 44 (1987) .......... 31

*Rodrigue v. Rodrigue*,
218 F.3d 432 (5th Cir. 2000) .......... 26

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) .......... 36, 37, 40

*Rumsfeld v. FAIR*,
547 U.S. 47 (2006) .......... 53

*Sekhar v. United States*,
570 U.S. 729 (2013) .......... 36

*Sharp v. Zeller*,
38 So. 449 (La. 1905) .......... 7, 27

*Sheetz v. Cnty. of El Dorado*,
601 U.S. 267 (2024) .......... *passim*

*Sherlock v. Thayer*,
4 Mich. 355 (1856) .......... 7, 27

*St. Joseph Abbey v. Castille*,
712 F.3d 215 (5th Cir. 2013) .......... 51

*State v. City Sav. Bank & Tr. Co.*,
127 So. 890 (La. 1930) .......... 8, 26, 41

*Terrace v. Thompson*,
263 U.S. 197 (1923) .......... 7, 28, 37

*The Civil Rights Cases*,
109 U.S. 3 (1883)........................................................................*passim*

*Thompson v. Moran*,
19 La.App. 343 (La. Ct. App. 1932)..........................................................7

*Tondro v. Cushman*,
5 Wis. 279 (1856)........................................................................7, 27

*Tyler v. Hennepin Cnty.*,
598 U.S. 631 (2023)........................................................................*passim*

*U.S. Tr. Co. of N.Y. v. New Jersey*,
431 U.S. 1 (1977)........................................................................34

*Union Carbide Corp. v. Alexander*,
679 S.W.2d 938 (Tenn. 1984)..........................................................31

*United States v. Gen. Motors Corp.*,
323 U.S. 373 (1945)........................................................................28

*United States v. Petty Motor Co.*,
327 U.S. 372 (1946)........................................................................28

*Va. Hosp. & Healthcare Ass'n v. Roberts*,
671 F.Supp.3d 633 (E.D. Va. 2023)..........................................................30

*Vill. of Willowbrook v. Olech*,
528 U.S. 562 (2000)........................................................................48

*Waller v. Hanlon*,
922 F.3d 590 (5th Cir. 2019)..........................................................40

*Wilkinson v. Chiwawa Cmtys. Ass'n*,
327 P.3d 614 (Wash. 2014)..........................................................44

*Zaatari v. City of Austin*,
615 S.W.3d 172 (Tex. App. 2019)..........................................................51

*Zahn v. Bd. of Pub. Works*,
274 U.S. 325 (1927)........................................................................45

**Constitutional Provision**

U.S. Const. amend. V....24

**Statutes**

28 U.S.C. §1291....5

28 U.S.C. §1331....4

La. Civ. Code Ann. art. 2678 .... 27, 29, 40

Lafayette City Ordinance No.CO-094-2023.... 12, 45

Lafayette City Ordinance No.CO-094-2023 §6(i).... 12

Lafayette City Ordinance No.CO-094-2023 §6(ii)....11

Lafayette City Ordinance No.CO-135-2024 §3.... 12

Lafayette City Ordinance No.CO-182-2024.... 12

Lafayette City-Parish Consol. Gov't, La., Code §73-1(b).... 13, 14, 46

Lafayette City-Parish Consol. Gov't, La., Code §73-2(a)....11

Lafayette City-Parish Consol. Gov't, La., Code §73-2(c)....11

Lafayette City-Parish Consol. Gov't, La., Code §73-3 ....*passim*

Lafayette City-Parish Consol. Gov't, La., Code §73-7 ....*passim*

Lafayette City-Parish Consol. Gov't, La., Code §73-8 .... 13, 45, 52

Lafayette City-Parish Consol. Gov't, La., Code §73-15 ....12

Lafayette City-Parish Consol. Gov't, La., Code §73-18 ....12

Lafayette City-Parish Consol. Gov't, La., Code §73-25 ....12

Lafayette City-Parish Consol. Gov't, La., Code §73-26(a)....11, 29

Lafayette City-Parish Consol. Gov't, La., Code §89-21 ....11, 14, 47

Lafayette City-Parish Consol. Gov't, La., Code §89-21(d)....14

**Rules**

Fed. R. App. P. 4(a)(1)(A) .......... 5

Fed. R. Civ. P. 17 .......... 5, 53

Fed. R. Civ. P. 17(a)(3) .......... 54

**Other Authorities**

Avisheh Avini, *The Origins of the Modern English Trust Revisited*, 70 Tul. L. Rev. 1139 (1996) .......... 6

W. Blackstone, Commentaries on the Laws of England (1766) .......... 6, 26

David Faflik, Boarding Out: Inhabiting the American Literary Imagination, 1840-1860 (2012) .......... 6

Jamila Jefferson-Jones, *Airbnb and the Housing Segment of the Modern "Sharing Economy"*, 42 Hastings Const. L.Q. 557 (2015) .......... 6

Thomas W. Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev. 730 (1998) .......... 2, 8, 31

Eugene J. Morris, *New Developments in Federal Takings Law*, 7 Pace Envtl. L. Rev. 309 (1990) .......... 33

E.M. Peñalver, *Is Land Special?*, 31 Ecology L.Q. 227 (2004) .......... 34

Ngai Pindell, *Home Sweet Home?*, 29 St. Louis U. Pub. L. Rev. 41 (2009) .......... 51

Alan N. Polasky, *The Condemnation of Leasehold Interests*, 48 Va. L. Rev. 477 (1962) .......... 27, 29

Sally Brown Richardson, *Reframing Ameliorative Waste*, 65 Am. J. Comp. L. 335 (2017) .......... 6

Jed Rubenfeld, *Usings*, 102 Yale L.J. 1077 (1993) .......... 34

Nicholas Spear, *Taking Leases*, 80 U. Chi. L. Rev. 2005 (2013) .......... 26

## INTRODUCTION

This appeal concerns an unprecedented and discriminatory effort in Lafayette, Louisiana, to ban "short term rentals" of single-family residences that last less than 30 days. Since long before this Nation's founding, property owners—by virtue of their property ownership—have enjoyed the ability to include guests on their properties and lease their homes to others for short-term durations. Such rentals make homeownership possible for some and involve fundamental aspects of property ownership for all. But such rentals are not just economic opportunities; they are constitutionally protected exercises of core property rights. Before 2023, Defendant-Appellee Lafayette City-Parish Consolidated Government (the "City" or "Lafayette") did not attempt to interfere with those core property rights. But in 2023, it abruptly shifted course and enacted an ordinance that categorically prohibits all property owners in neighborhoods zoned for single-family residences from renting their homes for less than 30 days ("Short-Term Rental Ordinance" or "Ordinance"). That outright ban on short-term leaseholds not only bucks historical tradition; it also flouts Supreme Court precedent and constitutional first principles.

As the Supreme Court has recently underscored, property ownership entails several "fundamental" rights. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149-50 (2021). One of them is the "right to exclude" unwanted third parties. *See id.* When governments interfere with the right to exclude, they effect a *per se* taking and must

pay just compensation under the Takings Clause. *See Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 274 (2024). But property ownership is not solitary confinement. Rather, for centuries, the necessary corollary of the right to exclude unwanted third parties has been the right to include wanted third parties, including on terms that allow the owner to afford her property in the first place—often via a lease. Those property rights (*i.e.*, the rights to include and to lease) are equally as fundamental as the right to exclude. The Supreme Court long ago recognized as much vis-à-vis the right to lease. *See The Civil Rights Cases*, 109 U.S. 3, 22 (1883). And the fundamental right to exclude, reaffirmed in *Cedar Point*, "encompass[es]" the corollary "right to include others." Thomas W. Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev. 730, 742-43 (1998). Accordingly, when the government forecloses a homeowner's rights to lease or to include/exclude—whether for long or short durations—it effects a *per se* taking. Indeed, if the government declared that homeowners are henceforth forever barred from leasing their property to anyone at all or from ever hosting family or friends, no one could seriously dispute that it had appropriated fundamental property rights. The conclusion is no different when the appropriation lasts for a shorter period or directly targets leasing; neither the duration nor the compensation for the hosting eliminates the taking.

Plaintiffs here—Michael DeSelle and Stellarising, LLC, as well as Rebecca Guidry and EPH320, LLC—are Lafayette homeowners who participated in the

historical tradition of short-term renting by welcoming paying short-term guests onto their properties. But because their homes are in districts zoned for single-family residences, they are now categorically barred by the Short-Term Rental Ordinance from exercising their fundamental rights to create leases with their preferred short-term durations. The Ordinance categorically precludes them from exercising their right to include tenants for a week without losing their corresponding right to exclude them for the next three. Those are *per se* takings—full stop. But at a minimum, the City's extraordinary actions constitute regulatory takings under the flexible three-prong balancing test set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). The economic impact and effect on investment-backed expectations are devastating, and the nature of the government action—a complete ban on Plaintiffs' ability to engage in the short-term leasing of their homes—reinforces that Lafayette has clearly gone too far in interfering with their fundamental property rights. Either way, this novel Ordinance cannot stand.

Adding insult to constitutional injury, Lafayette discriminates against Plaintiffs based on their exercise of fundamental property rights. While the Short-Tem Rental Ordinance flatly prohibits homeowners like Plaintiffs from offering short-term rentals, it simultaneously allows other Lafayette homeowners to engage in the very same activity, which the City concedes is residential activity. Lafayette thus fails to treat similarly situated homeowners alike, all on the basis of the exercise

of constitutionally protected property rights. That runs afoul of basic equal-protection guarantees and triggers strict scrutiny, which Lafayette cannot satisfy. *See, e.g.*, *Att'y Gen. v. Soto-Lopez*, 476 U.S. 898, 904 (1986) (plurality op.) (collecting cases).

Although the Short-Term Rental Ordinance is doubly unconstitutional, the district court dismissed Plaintiffs' claims at the threshold. That decision is untenable. The court below managed to dismiss the operative complaint only by distorting settled law and disregarding its duty to safeguard constitutional rights against government overreach—viewing the question whether Lafayette could appropriate Plaintiffs' constitutionally protected rights via discriminatory means as a mere "policy determination" that the judiciary cannot second-guess. ROA.26-30179.784. This Court should reverse that misguided decision and reaffirm that "[t]he very enumeration of [constitutional] right[s] takes out of the hands of government … the power to decide … whether th[ose] right[s] [are] *really worth* insisting upon." *NYSRPA v. Bruen*, 597 U.S. 1, 23 (2022).

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §1331. After reviewing Plaintiffs' specific objections to the magistrate judge's report and recommendation, it dismissed the amended complaint on March 12, 2026. *See* ROA.26-30179.782-84. Plaintiffs timely filed their notice of appeal on March 26,

2026. *See* ROA.26-30179.785; Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1. Whether the Short-Term Rental Ordinance's ban on short-term rentals in districts zoned for single-family residences appropriates Plaintiffs' fundamental property rights without just compensation, in violation of the Takings Clause.

2. Whether the Short-Term Rental Ordinance's discriminatory treatment of homeowners, like Plaintiffs, who own properties in districts zoned for single-family residences violates the Equal Protection Clause.

3. Whether the district court erred in dismissing Plaintiffs DeSelle and Guidry from this suit under Federal Rule of Civil Procedure 17.

## STATEMENT OF THE CASE

### A. The Right to Lease and the Right to Exclude/Include.

Short-term rentals are not some 21st-century innovation. For as long as society has enforced property rights, owners have tapped into the value of their properties—and, in particular, their homes—by opening them up for the temporary use and enjoyment of others, including for compensation. That practice reflects the reality that property owners possess inherent rights to lease their properties to others and to include/exclude others on their land, including for short-term durations.

1. As a fundamental incident of property ownership, the right to lease one's home has deep historical roots that long predate this Nation's founding. The

lease traces its origin to the *locatio conductio* of Roman law and the "uses" of English common law. *See* Sally Brown Richardson, *Reframing Ameliorative Waste*, 65 Am. J. Comp. L. 335, 348 (2017); Avisheh Avini, *The Origins of the Modern English Trust Revisited*, 70 Tul. L. Rev. 1139, 1143-45 (1996). These arrangements, like the modern lease that followed, allowed owners to reap the benefits of ownership by transferring their property for the use and enjoyment of others, which in turn enabled capital-poor members of society to access and develop the property that they leased. *See* Richardson, *supra*, at 349; 2 W. Blackstone, Commentaries on the Laws of England 141 (1766).

That longstanding tradition of leasing continued on this side of the Atlantic. Americans in the early Republic recognized the underlying value of their properties and reaped substantial economic benefits by treating their "living space as a[] [valuable] exchange commodity." David Faflik, Boarding Out: Inhabiting the American Literary Imagination, 1840-1860, at 40 (2012). As a result, they routinely turned to leasing their homes to guests on short-term bases. *See* Jamila Jefferson-Jones, *Airbnb and the Housing Segment of the Modern "Sharing Economy"*, 42 Hastings Const. L.Q. 557, 561-63 (2015); *see also, e.g.*, *Faw v. Marsteller*, 6 U.S. (2 Cranch) 10 (1804). Given this dynamic, cases from around the Founding frequently addressed the rights and responsibilities associated with leases. *See, e.g.*, *Pelletreau v. Jackson ex dem. Varick*, 11 Wend. 110 (N.Y. Sup. Ct. 1833); *Herbert v.*

*Wren*, 11 U.S. (7 Cranch) 370 (1813). And in the first half of the 19th century, the leasehold only grew in popularity as Americans began to exercise the fundamental right to lease their properties on a short-term basis, largely through week-to-week tenancies. *See, e.g.*, *Curley v. Dean*, 4 Conn. 259 (1822) (discussing weekly tenancy); *Jackson ex dem. Russell v. Rowland*, 6 Wend. 666 (N.Y. Sup. Ct. 1831) (dwelling-house tenant held a weekly tenancy); *Reeves v. Dougherty*, 15 Tenn. (7 Yer.) 222 (1834) (similar). That tradition of leasing, including short-term leasing, continued throughout the rest of the 19th century and into the early-20th century, as cases from Louisiana[1] and elsewhere around the country[2] confirm.

Due to the deep historical roots of leasing—both before and after the Founding and at the time of the adoption of the Fourteenth Amendment—courts have vigorously protected the practice. The U.S. Supreme Court long ago declared that the right to lease is an "essential attribute[] of property," *Terrace v. Thompson*, 263 U.S. 197, 215 (1923), and one of those "fundamental rights which are the essence of

[1] *See, e.g.*, *Sharp v. Zeller*, 38 So. 449, 451 (La. 1905) (rental properties "leasable … by the week"); *Barrere v. Shuber*, 5 La.App. 67, 68 (La. Ct. App. 1926) (owner sought damages for her inability to "rent[] two rooms at five dollars per week"); *Thompson v. Moran*, 19 La.App. 343, 344 (La. Ct. App. 1932) (weekly rental of a room); *Butler v. Jones*, 21 So.2d 181, 182 (La. Ct. App. 1945) (similar); *Muller v. Reynolds*, 26 So.2d 498, 498 (La. Ct. App. 1946) (daily rental of a "residence").

[2] *See, e.g.*, *Horton v. Handvil*, 3 A. 72 (N.J. Ch. 1886); *Tondro v. Cushman*, 5 Wis. 279 (1856); *Sherlock v. Thayer*, 4 Mich. 355 (1856); *see also Raymond v. Strickland*, 52 S.E. 619 (Ga. 1905).

civil freedom," *Civil Rights Cases*, 109 U.S. at 22. Louisiana's highest court similarly explained nearly a century ago that "the right to lease … may be regarded as an incident of ownership" that receives full federal constitutional protections afforded to other property rights. *State v. City Sav. Bank & Tr. Co.*, 127 So. 890, 891 (La. 1930).

2. Apart from the right to lease, the Supreme Court has also underscored that the right to exclude/include enjoys robust constitutional protections. In *Cedar Point*, the Court emphasized that "the right to exclude is 'universally held to be a fundamental element of the property right,'" 594 U.S. at 150, and "one of the most essential sticks in the bundle of rights that are commonly characterized as property"—indeed, "the '*sine qua non*' of property," *id.* (quoting Merrill, *supra*, at 730). Thus, the Court held that the appropriation of the right to exclude is a *per se* taking, regardless whether it is accomplished via "regulation," "statute," "ordinance," or other means. *Id.* at 149-50, 152.

The "right to exclude," however, is just one manifestation of a broader "gatekeeper power" that property owners possess—*i.e.*, "the right to determine who has access to particular resources and on what terms." Merrill, *supra*, at 740 n.37. The right to exclude thus "encompass[es] … the owner's right to *include* others." *Id.* at 742-43 (emphasis added). As detailed above, property owners have historically "included" others on their property by exercising their right to lease it,

including on short-term bases. It thus is unsurprising that the Supreme Court has treated those rights as corollary rights that merit equal constitutional protection under the Takings Clause. *See, e.g.*, *Dolan v. City of Tigard*, 512 U.S. 374, 394 (1994). Indeed, the inseparable connection between the rights to include and exclude is well illustrated by government attempts to dictate minimum lease terms: A mandate that leases last at least 30 days simultaneously precludes a property owner's right to *include* guests for shorter periods and her right to *exclude* a tenant after any shorter period ends.

In short, leasing arrangements—including short-term leasing arrangements—are doubly protected through two fundamental property rights: the right to lease and the right to include/exclude, which are in turn protected by the Takings Clause against government efforts to regulate those fundamental rights away. *See Tyler v. Hennepin Cnty.*, 598 U.S. 631, 638 (2023) (Constitution draws on "traditional property law principles" and "historical practice" to protect property rights).

**B. Legal Background.**

1. Over the last two decades, the popularity of short-term rentals in the United States has skyrocketed, in large part because of digital platforms like Airbnb. *See* ROA.26-30179.80-81.¶35. Louisianans generally and denizens of Lafayette specifically have counted themselves among the property owners who have exercised their fundamental property rights to offer short-term rentals. *See* ROA.26-

30179.81.¶¶36-37. These short-term rentals, moreover, have brought benefits to Lafayette, property owners, and guests alike: They allow owners to realize the true value of their land while enabling guests—who contribute to Lafayette's tourist industry—to experience one of the Nation's great "hidden gems." ROA.26-30179.81.¶38. These benefits have come without any observable adverse impacts. *See* ROA.26-30179.81.¶39.

Nonetheless, in 2020—after having never regulated short-term rentals previously—Lafayette considered an ordinance to restrict short-term rentals. *See* ROA.26-30179.82.¶40. Though it would have imposed unnecessary licensing restrictions, the proposal at least would have recognized that property owners could offer short-term rentals *as of right*—in accord with longstanding historical practice. *See* ROA.26-30179.82.¶41. The City ultimately tabled the proposal, and property owners continued to freely exercise their fundamental property rights without interference. *See* ROA.26-30179.82.¶42.

2. All that changed in 2023. At a July 2023 meeting, Lafayette's City Council considered a proposal that prohibited short-term rentals in neighborhoods zoned for single-family residences—which comprise 75% of Lafayette's residential areas. *See* ROA.26-30179.82-83.¶43. That proposal (the Short-Term Rental Ordinance) moved forward, notwithstanding public comments highlighting that it would eviscerate property rights and restrict income streams for homeowners and

that single-family property owners generally have more control over short-term tenants and therefore can more effectively minimize nuisances. *See* ROA.26-30179.83.¶¶44-46. Despite these benefits, the clear interference with property rights, and the established practice of offering short-term rentals in the community, Lafayette adopted the Ordinance, which the Mayor-President signed into law on October 6, 2023. *See* ROA.26-30179.84.¶¶47-48.

Where it applies, the Short-Term Rental Ordinance's effects are devastating and categorical. No homeowner in a single-family-residence-zoned neighborhood may "offer[] one or more guest rooms" "suitable and utilized solely for temporary residential occupancy for a period of fewer than 30 consecutive days, in exchange for compensation." Lafayette City-Parish Consol. Gov't, La., Code §§73-7, 73-26(a) [hereinafter "Lafayette Code"]; *see id.* §§73-3, 89-21 (Table 89-21-2 Use Table). This categorical ban applies regardless whether homeowners offered short-term-rentals "prior to or subsequent to" the Ordinance's enactment. *Id.* §73-2(a), (c). Indeed, recognizing its interference with existing uses and reliance interests, Lafayette directed all affected homeowners to "cease all operations" of short-term rentals "within 12 months" of the Ordinance's effective date (*i.e.*, by October 6, 2024), foreclosing all pre-existing, non-conforming uses. Lafayette City Ordinance No.CO-094-2023 §6(ii), https://perma.cc/E4U2-BR6X.

The Short-Term Rental Ordinance does not, however, extend these same draconian restrictions to all residential homeowners. Homeowners in other zoning districts can still offer short-term rentals (albeit subject to licensing requirements and other obligations). *See* Lafayette Code §§73-3, 73-15 to -18, 73-25. Furthermore, even when the City forbids short-term rentals in those districts, it enables some owners to offer pre-existing, non-conforming short-term rentals. *See* Ordinance No.CO-094-2023, *supra*, §6(i). In fact, Lafayette reconsidered some of its restrictions in other districts and ultimately amended the Ordinance twice to give certain property owners more time to seek approval for pre-existing, "nonconform[ing]" short-term rentals outside of single-family residential districts, *see* Lafayette City Ordinance No.CO-135-2024 §3, https://perma.cc/4CJP-9PW3, and authorize additional short-term rentals in downtown Lafayette, *see* Lafayette City Ordinance No.CO-182-2024, https://perma.cc/N3LS-YCUS.

Lafayette barely attempted to justify its decision to destroy the fundamental rights of owners of single-family residences to lease and to include/exclude others—let alone explain why it did so in a discriminatory fashion. The Short-Term Rental Ordinance contains no specific legislative findings about the impact of short-term rentals on the City or other property owners. See Ordinance No.CO-094-2023, *supra*. Instead, Lafayette just asserted that it adopted the Ordinance "to further the health, safety and welfare of the citizens of the City," *id.* at 1, and advanced the *ipse*

*dixit* that its restrictions are "necessary to promote, protect and preserve the general welfare, safety, health, peace, good order and economy of Lafayette … and to preserve the integrity of Lafayette's neighborhoods," Lafayette Code §73-1(b). Furthermore, although it had multiple opportunities to supplement those assertions in this litigation, Lafayette never did—instead invoking only abstract "community concerns" about potential nuisances that short-term rentals *might* cause, ROA.26-30179.751; *see* ROA.26-30179.148, 151, while failing to muster any concrete evidence to substantiate that speculation, *see* ROA.26-30179.647-48.n.11.

Those nebulous concerns are difficult to credit. The Short-Term Rental Ordinance itself requires those offering short-term rentals to "abide by all existing state and local laws and ordinances." Lafayette Code §73-8. Lafayette has never explained why those regulations—which fall on all property owners equally—fail to address any potential land-use concerns related to short-term rentals. After all, monthly renters, non-paying guests, and full-time residents are equally capable of making noise or straining parking. Indeed, the Ordinance expressly identifies preexisting land-use laws that address nuisance behavior, including setting standards for noise, waste disposal, and traffic control, *see id.*, that short-term rentals must follow—rendering implausible the City's suggestion that it had to categorically ban certain short-term rentals to prevent those same nuisances, *see* ROA.26-30179.751 (speculating about potential "traffic, noise, [and] trash" that short-term rentals may

cause). Furthermore, in line with jurisdictions across the country, *see infra* pp.43-44, the City also explicitly recognizes that short-term rentals are a form of "*residential* occupancy." Lafayette Code §73-7 (emphasis added); *see id.* §89-21(d). Even so, Lafayette has taken the bewildering position that, to "preserve the integrity" of its *residential* neighborhoods, *id.* §73-1(b), owners of single-family residences cannot offer *residential* leases to short-term guests, *id.* §§73-3, 89-21 (Table 89-21-2 Use Table).

**C. Factual and Procedural Background.**

1. Plaintiffs DeSelle and Guidry are Lafayette residents and long-time Louisianians who—via their families' limited liability companies, Plaintiffs Stellarising, LLC, and EPH320, LLC—own properties in districts zoned for single-family residences.[3] *See* ROA.26-30179.76.¶¶17-20. Plaintiff DeSelle's Saint Joseph Street property, which has two separate units where guests can stay, is a short walk from the University of Louisiana at Lafayette and its football stadium. *See* ROA.26-30179.87-88.¶65. Plaintiff Guidry's Steeple Chase property is centrally located only minutes from where Lafayette holds its Mardi Gras parades and is a short drive from downtown. *See* ROA.26-30179.90.¶71. Because their properties

[3] This brief refers to Plaintiffs DeSelle and Stellarising as "Plaintiff DeSelle" and to Plaintiffs Guidry and EPH320 as "Plaintiff Guidry," except when the distinction makes a difference, because—as noted below, *see* ROA.26-30179.708.n.3; ROA.26-30179.632.n.3—Plaintiffs DeSelle and Stellarising are pressing the same constitutional claims together, as are Plaintiffs Guidry and EPH320.

are in ideal locations for guests to attend sporting events, festivals, and concerts; visit family; or just vacation in Lafayette, Plaintiffs DeSelle and Guidry took advantage of their fundamental property rights to offer short-term rentals before the Short-Term Rental Ordinance took effect. *See* ROA.26-30179.88-89.¶¶66-67; ROA.26-30179.90.¶¶71-72.

Each spent considerable financial resources in preparation. Plaintiff DeSelle spent approximately $90,000 to renovate the house on the property that he manages, convert the garage into a studio apartment, and purchase furniture, appliances, and décor so that both units could house short-term guests. *See* ROA.26-30179.88.¶66. Plaintiff Guidry similarly made significant investments to update the property (which she inherited from her father) for short-term rentals—*e.g.*, adding stonework and furnishings, converting a wood-burning fireplace to electric, and redoing the floors. *See* ROA.26-30179.90.¶72.

These significant investments paid off—at least until Lafayette interfered by enacting the Short-Term Rental Ordinance. Plaintiff DeSelle offered short-term rentals in both units on his property through July 31, 2024. *See* ROA.26-30179.88.¶66. During that time, the property remained occupied 90-100% of the week with short-term renters, which enabled him to earn upwards of $6,000 per month, resulting in gross earnings of $59,391 in 2023 and $52,106 through July 2024. *See* ROA.26-30179.88-89.¶67. Plaintiff DeSelle's efforts earned him a

"Guest Favorite" distinction on Airbnb. ROA.26-30179.88-89.¶67. Plaintiff Guidry likewise took full advantage of her ability to interact with and welcome guests onto her property by frequently offering short-term rentals at her property from 2022 until the summer of 2024. *See* ROA.26-30179.90.¶72. During that time, she earned around $50,000 a year. *See* ROA.26-30179.90.¶72. Plaintiffs DeSelle and Guidry received zero complaints from neighbors regarding their short-term rentals. *See* ROA.26-30179.88-89.¶67; ROA.26-30179.90.¶72.

The Short-Term Rental Ordinance stopped this exercise of property rights in its tracks. Although the properties where Plaintiffs DeSelle and Guidry host guests are in attractive locations for short-term guests, they are now precluded from exercising their fundamental property rights because their properties are in the sole residential district that Lafayette has singled out for its prohibition on short-term rentals—districts zoned for single-family residences. *See* ROA.26-30179.89.¶68; ROA.26-30179.91.¶73. Plaintiffs thus have reluctantly converted their properties to long-term rentals to comply. *See* ROA.26-30179.89.¶68; ROA.26-30179.91.¶73. But they would immediately resume offering short-term rentals if allowed because they strongly prefer short-term-rental guests, with both agreeing that such guests are better stewards of the properties as compared to long-term renters. *See* ROA.26-30179.87-88.¶65; ROA.26-30179.89-90.¶69; ROA.26-30179.91.¶74.

The City-imposed transition away from short-term rentals has caused a steep financial loss. Plaintiff DeSelle has earned significantly less while leasing to long-term tenants (*i.e.*, only around $1,700 per month for the home and around $1,300 per month for the studio), which has prevented him from realizing a profit on the property. *See* ROA.26-30179.89-90.¶¶68-69. Thus, Plaintiff DeSelle can no longer financially justify keeping the property. But the Short-Term Rental Ordinance has simultaneously directly depressed his property's value. Indeed, Plaintiff DeSelle has put his home on the market at "a price that is commensurate with the investments he poured into the property," but no one has bitten, as potential buyers appear unwilling to overpay for real estate lacking the full suite of property rights. ROA.26-30179.89-90.¶69. Plaintiff Guidry likewise has taken a financial hit. After the Ordinance took effect, she has earned at most $3,000 per month leasing the property to long-term tenants, but had only sporadic success finding such tenants, preventing her from maximizing her property's use for rentals. *See* ROA.26-30179.91.¶73.

2. Plaintiffs sued to vindicate their constitutional rights, filing their operative complaint in July 2025. Plaintiffs alleged that the Short-Term Rental Ordinance violates the Takings Clause (Counts I and II), as it effects both *per se* and regulatory takings of their fundamental rights to lease and to include/exclude others on their properties without providing just compensation. *See* ROA.26-30179.92-100.¶¶78-109. They also alleged that the Ordinance violates the Equal Protection

Clause (Count III), since it impermissibly singles out their residential neighborhoods for the ban on short-term rentals. *See* ROA.26-30179.100-03.¶¶110-18.

The City moved to dismiss in August 2025. Following briefing on the motion, the assigned magistrate judge issued a report and recommendation ("R&R") and urged the district court to grant it in full. *See* ROA.26-30179.677. The R&R recognized that Plaintiffs Stellarising and EPH320 have standing as the titleholders of the properties at issue. ROA.26-30179.680-81. But because the City had challenged Plaintiffs DeSelle's and Guidry's independent ability to participate in this action, the R&R suggested that the district court issue an advisory determination that the individual plaintiffs lack an Article III injury-in-fact, on the theory that only a "direct harm" qualifies. ROA.26-30179.680-81.

Turning to the merits, the R&R recommended dismissal across the board. It concluded that Plaintiffs failed to establish a *per se* taking of their fundamental property rights, reasoning that only a physical interference with property can ever give rise to a *per se* taking. ROA.26-30179.682-84. As to Plaintiffs' regulatory-takings claim, the R&R recognized that Plaintiffs had satisfied the first two prongs of the three-prong *Penn Central* test, but it nonetheless found no regulatory taking based on their supposed failure to meet the final prong addressing the "character of the government action." ROA.26-30179.684-88. According to the R&R, Plaintiffs could not satisfy that prong because short-term rentals are mere "commercial" uses

of property, and the Ordinance advanced a "legitimate [local] purpose" to regulate them. ROA.26-30179.687-88. Finally, the R&R recommended dismissal of Plaintiffs' equal-protection claim on the grounds that Lafayette's Ordinance did not implicate any fundamental rights for substantive-due-process purposes (as opposed to equal-protection purposes); homeowners in other districts are not similarly situated despite engaging in "similar[]" residential uses of property; and the Ordinance rationally furthers the City's unsubstantiated nuisance-prevention and protection-of-neighborhood-character goals. ROA.26-30179.687-91.

3. Plaintiffs timely lodged specific objections to the R&R's erroneous legal determinations. *See* ROA.26-30179.693. Only two days after Lafayette responded, the district court issued a two-and-a-half-page decision dismissing the operative complaint in full. It first rejected the R&R's invitation to inquire into whether Plaintiffs DeSelle and Guidry independently had Article III standing, finding it unnecessary to do so since the LLCs plaintiffs unquestionably had standing to sue. ROA.26-30179.782. But the court nevertheless dismissed Plaintiffs DeSelle and Guidry from the case, asserting that no separate "relief can be granted" to an LLC's members based on harms to the LLC itself, ROA.26-30179.783—even though Plaintiffs DeSelle and Guidry did not pursue any claims beyond those brought by their respective LLCs, *see supra* p.14.n.3,

On the merits, the district court agreed with the R&R's reasoning and, without addressing Plaintiffs' objections individually, adopted that portion of the R&R *in toto*. ROA.26-30179.782-83.[4] Instead, the court denigrated Plaintiffs' constitutional challenge to the City's authority to interfere with their constitutionally protected property and equal-protection rights as a mere "policy" debate beyond the scope of judicial authority. ROA.26-30179.783-84. The court therefore dismissed this action with prejudice. ROA.26-30179.784.

## SUMMARY OF ARGUMENT

Lafayette's Short-Term Rental Ordinance violates both the Takings Clause and the Equal Protection Clause. The district court's contrary reasoning is uniformly meritless, and it only compounded its errors by gratuitously dismissing the individual plaintiffs from this case. This Court should reverse.

I. The Short-Term Rental Ordinance effects uncompensated *per se* and regulatory takings of Plaintiffs' fundamental property rights in violation of the Takings Clause. As the Supreme Court has explained in *Cedar Point* and other cases, government appropriation of or interference with fundamental property rights amounts to a *per se* taking. The right to lease and the right to include/exclude are two such fundamental property rights. Indeed, the right to lease (and attendant

[4] Because the district court incorporated the R&R's merits analysis in its dismissal order, *see* ROA.26-30179.783, this brief treats any statement in the R&R that the dismissal order adopted as coming from the "district court" itself.

ability to define its term) is an attribute of property deeply rooted in Louisiana law, longstanding historical practice, and Supreme Court precedent. And the right to include is simply the corollary of the well-recognized fundamental right to exclude. The *raison d'être* of the Ordinance, however, is to interfere with those rights by preventing property owners like Plaintiffs from creating leases with preferred short-term durations. Those are *per se* takings.

The district court reached a contrary conclusion only by insisting that *per se* takings require physical intrusions on property and by claiming that whether a right is fundamental to what it means to own property is irrelevant to the takings analysis. That (il)logic is irreconcilable with *Cedar Point*, a host of other cases, and common sense. The City would plainly appropriate fundamental property rights if it told its residents that they could never lease their properties at all or if it forever barred them from having guests over for company. Neither the duration of the rental nor the financial basis of the invitation changes the analysis.

Although the existence of a *per se* taking is sufficient to reverse, the Short-Term Rental Ordinance also effects a regulatory taking under the three-prong *Penn Central* balancing test. In fact, the district court agreed (and the City ultimately did not dispute) that Plaintiffs adequately alleged that the Ordinance imposes a severe economic impact and frustrates their historically grounded, investment-backed expectations. Those determinations regarding the first two *Penn Central* prongs are

eminently correct, and the Supreme Court has made clear that those two factors are the principal considerations in the regulatory-takings analysis. *See Lingle v. Chevron U.S.A.*, 544 U.S. 528, 538-40 (2005).

The district court nonetheless rejected Plaintiffs' regulatory-takings claim based solely on the third *Penn Central* factor—the "character of the government action"—reasoning that the Ordinance constitutes a mere land-use regulation of commercial activity. That is doubly erroneous. First, leasing a home for another to reside in and use as a home—as opposed to leasing a premises to enable another to conduct a business from it—is *residential* (not commercial) activity. *See* Lafayette Code §73-7; *Pandharipande v. FSD Corp.*, 679 S.W.3d 610, 627 (Tenn. 2023). Indeed, no one doubts that fact when it comes to long-term leases, and a shorter version of a residential use does not somehow transform it into a commercial use. Second, the character-of-government-action prong turns not on commercial status, but the extent of the government intrusion—*viz.*, whether the government has gone too far. Here, the City's complete ban on short-terms leases goes beyond mere regulation to prohibition and thus the character of the government action cuts in favor of finding a taking. That is especially true where, as here, Lafayette already has generally applicable laws directly targeting any potential nuisance or land-use concerns that the City may have. With all three *Penn Central* factors satisfied, the case for a taking is overwhelming.

II. The Short-Term Rental Ordinance likewise runs afoul of the Equal Protection Clause. It authorizes only a select subset of Lafayette homeowners to engage in short-term rentals and exercise their constitutionally protected, fundamental property rights, while barring others (including Plaintiffs) from engaging in that same residential activity. Discrimination involving constitutionally protected rights triggers strict scrutiny, and the City has never suggested that it could satisfy that high standard. The district court sustained the Ordinance only by rejecting heightened scrutiny after considering substantive-due-process precedents and then applying rational-basis review. But even if rational-basis review applies here (it does not), the Ordinance is the rare measure that flunks even that standard. Lafayette has multiple options for addressing perceived problems with short-term rentals, from strengthening regulations applicable to all property owners to grandfathering existing short-term rentals with no history of violations. Instead, the City chose to preclude some homeowners entirely while going out of its way to relax regulations elsewhere. That is discrimination pure and simple, not a rational reaction to an actual problem.

III. The district court erred in dismissing Plaintiffs DeSelle and Guidry from this suit. By litigating alongside the LLC plaintiffs, which indisputably have Article III standing, the court below correctly recognized that the question whether the individual plaintiffs independently have Article III standing is academic. But the

court purged them from this litigation because the LLC plaintiffs are the real parties in interest. That holding is mistaken. As other courts have recognized, while Federal Rule of Procedure 17 requires the participation of the real parties in interest (here, the LLC plaintiffs), nothing in that rule requires dismissing other plaintiffs once those real parties in interest are already participating in the case.

## STANDARD OF REVIEW

When (as here) the district court reviews *de novo* an R&R regarding a Rule 12(b)(6) motion to dismiss, this Court also "review[s] [the] Rule 12(b)(6) dismissal *de novo,* accepting all well-plead facts as true." *Morin v. Moore*, 309 F.3d 316, 319 (5th Cir. 2002).

## ARGUMENT

### I. Lafayette's Short-Term Rental Ordinance Violates The Takings Clause.

The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. "By requiring the government to pay for what it takes, the Takings Clause saves individual property owners from bearing 'public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Sheetz*, 601 U.S. at 273-74. Government action that triggers the Takings Clause is divided into "*per se* takings" and "regulatory takings." *See Cedar Point*, 594 U.S. at 146-49. By barring Plaintiffs from exercising their fundamental property rights to offer short-term rentals on their properties, Lafayette's Short-Term Rental Ordinance works a taking under both frameworks.

### A. The Ordinance's Prohibition on Short-Term Rentals Effects *Per Se* Takings.

*Per se* takings occur whenever government interference with property effects "a direct government appropriation *or* physical invasion of private property." *Lingle*, 544 U.S. at 537 (emphasis added). The disjunctive "or" is significant. *Per se* takings are not limited to scenarios where the government actually invades property: "Neither formal acquisition of the property's title nor actual possession of the property is required for government action to constitute a [*per se*] taking." *Alford v. Walton Cnty.*, 159 F.4th 844, 855 (11th Cir. 2025). Rather, the government effects a *per se* taking whenever it appropriates "a fundamental element of the property right," *Cedar Point*, 594 U.S. at 149-50, or "otherwise interfere[s]" with that fundamental right, *see Sheetz*, 601 U.S. at 274. *Accord Curtin v. Benson*, 222 U.S. 78, 86 (1911) ("prevention of a legal and essential use" of property—"an attribute of … ownership"—is a *per se* taking). When the taking of a fundamental property right occurs, there is no balancing of interests; the government instead has a categorical duty to stop or pay just compensation. *See Sheetz*, 601 U.S. at 274.

To determine whether the Takings Clause protects a property interest from government appropriation, courts look to state law, "traditional property law principles," "historical practice," and "[Supreme Court] precedents." *Tyler*, 598 U.S. at 638. The rights to lease and to include/exclude are two fundamental rights that inhere in property ownership and enjoy the Takings Clause's protection. *See*

*supra* pp.5-9. Because the Short-Term Rental Ordinance appropriates those rights, it has effected *per se* takings.

1. Start with the right to lease. Louisiana law has long recognized that the right to lease is a right incident to an owner's title to the property. "[F]ull ownership" of property under Louisiana law has three primary components, and the second encompasses leasing: the "(1) *usus*—the right to use or possess, *i.e.*, hold, occupy, and utilize the property; (2) *abusus*—the right to abuse or alienate, *i.e.*, transfer, *lease*, and encumber the property, and (3) *fructus*—the right to the fruits, *i.e.*, to receive and enjoy the earnings, profits, rents, and revenues produced by or derived from the property." *Rodrigue v. Rodrigue*, 218 F.3d 432, 436-37 (5th Cir. 2000) (emphasis added). That is why, for nearly a century, the Louisiana Supreme Court has made clear that "the right to lease one's own property may be regarded as an incident of ownership" receiving full federal constitutional protections afforded to other property rights. *City Sav. Bank*, 127 So. at 891.

Those protections safeguard an owner's ability to create leasehold interests of *any* duration, as a lease's term—both as a matter of Louisiana law and traditional property-law principles generally—is its defining characteristic. *See* Nicholas Spear, *Taking Leases*, 80 U. Chi. L. Rev. 2005, 2016 (2013) ("unlike a fee simple, a lease is not of infinite duration"); Blackstone, *supra*, at 103-04, 140 (whether a property interest "is circumscribed within a certain number of years, months, or

days" separates estates, like the leasehold, from the "freehold"); La. Civ. Code Ann. art. 2678 (all leases "shall be for a term," whose "duration" is defined "by the parties"). Thus, although the modern lease "embraces widely differing types of property ownership," the "common denominator" is "the agreement by the lessee to pay some 'rent' and the right of the lessor to a return of the property at the conclusion of the term"—*i.e.*, a finite period of time. Alan N. Polasky, *The Condemnation of Leasehold Interests*, 48 Va. L. Rev. 477, 488-89 (1962). There is simply nothing magical (or constitutionally significant) about monthly rentals. Rather, throughout our Nation's history, rentals for shorter periods have proven commonplace.

Louisiana's practice reflects this wider historical practice. For centuries, property owners have leased their properties to others to unlock the full value of their homes. *See supra* pp.5-8. Property owners exercised the right to lease both before and after the Founding and the adoption of the Fourteenth Amendment. *See Alexander v. Harris*, 8 U.S. (4 Cranch) 299 (1808); *Faw*, 6 U.S. (2 Cranch) 10; *Tondro*, 5 Wis. 279. And they frequently did so by creating leasehold interests of short-term durations. *See supra* p.7 & nn.1-2; *see also Sherlock*, 4 Mich. 355 (describing weekly tenancy); *Horton*, 3 A. 72 (same); *Sharp*, 38 So. at 451 (properties "leasable … by the week"); *Barrere*, 5 La. App. at 68 (owner had "rent[ed] two rooms at five dollars per week"). That is why the Supreme Court has long recognized that "the Constitution protects" "the right to … lease," as an

"essential attribute[] of property," *Terrace*, 263 U.S. at 215, and one of the "fundamental rights which are the essence of civil freedom," *Civil Rights Cases*, 109 U.S. at 22.

That Louisiana law and federal courts have consistently and uniformly understood that the right to lease inheres in property ownership leaves no doubt that the right to lease qualifies as a fundamental property right. *See Tyler*, 598 U.S. at 638. Accordingly, government appropriations of the right to lease constitute *per se* takings. *See Cedar Point*, 594 U.S. at 149. Consistent with that understanding, the Supreme Court has regularly awarded just compensation to property owners when the government appropriates leasehold interests—regardless whether it takes the entire leasehold interest, *see, e.g.*, *United States v. Petty Motor Co.*, 327 U.S. 372 (1946), or only part of it, *see, e.g.*, *United States v. Gen. Motors Corp.*, 323 U.S. 373 (1945). *See Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295, 303-04 (1976) (describing how to calculate just compensation owed to a lessor); *see also Kohl v. United States*, 91 U.S. 367, 377-78 (1875) (all owners of estates or interests in the seized parcel of land can recover for the appropriation of their property rights).

While these cases involved existing leases, the takings analysis remains the same when government seeks to bar the creation of such leaseholds *ab initio*. The government obviously could not *categorically* deny homeowners the right to lease their properties—that would extinguish one of the fundamental incidents of property

ownership and limit ownership to the few who can afford homes without any need for rental income. *See Curtin*, 222 U.S. at 86 (prohibition on owner's exercise of his rights to access his property and graze cattle on it effected a taking by "destroy[ing] [an] essential use[]" of property). Precluding rentals for anything less than a government-specified period of time, whether a year or a month, is not materially different. It may impact the amount of compensation ultimately due, but it does not eliminate the *per se* taking. *See Cedar Point*, 594 U.S. at 153.

Lafayette's ban on short-term rentals effects a *per se* taking of the right to lease. For property owners like Plaintiffs who own property in neighborhoods zoned for single-family residences, Lafayette categorically bars them from exercising their right to create leasehold interests containing terms of less than 30 days. *See* Lafayette Code §§73-7, 73-26(a). By preventing these owners from creating leases with their preferred short-term durations, Lafayette has appropriated a fundamental "stick[] in the bundle of rights that inhered in ownership." *Hearts Bluff Game Ranch v. United States*, 669 F.3d 1326, 1330 (Fed. Cir. 2012). Indeed, a lease's duration is what makes a lease a lease, *see supra* pp.26-27; La. Civ. Code Ann. art. 2678—*viz.*, a lease's term is the "common denominator" of all leasing arrangements, Polasky, *supra*, at 489.

Thus, when the government seizes the owner's ability to define the duration of a lease's term and dictates for the property owner (over her objection) how long

others may stay, it necessarily deprives her of the right to lease. *Contra* ROA.26-30179.689 (ignoring that the right to lease encompasses the right to define its term). The Takings Clause precludes such government action—it does not permit Lafayette to step into the shoes of property owners and commandeer the right to lease without paying just compensation. *See, e.g.*, *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1294 (Fed. Cir. 2008) (government's commandeering the water's flow effected a *per se* taking of water rights); *Va. Hosp. & Healthcare Ass'n v. Roberts*, 671 F.Supp.3d 633, 651 (E.D. Va. 2023) ("[G]overnment cannot commandeer a professional's service and time for public use without providing just compensation.").

2. The Short-Term Rental Ordinance likewise effects a *per se* taking of the right to include/exclude. As *Cedar Point* explained, a property owner's "right to exclude" is "'one of the most treasured' rights of property ownership" and "one of the most essential sticks in the bundle of rights that are commonly characterized as property"—"the '*sine qua non*' of property." 594 U.S. at 149-50. Hence, the government effects a *per se* taking whenever it appropriates the owner's right to exclude. *See id.* at 149.

By dictating the minimum period of a permissible lease, Lafayette interferes directly with the right to exclude and include. To the extent that Plaintiffs would like to include tenants for five days and exclude them thereafter, the Ordinance robs

Plaintiffs of both rights. *Cedar Point* deals directly with the right to exclude, but the right to include is just its corollary.[5] To say that property owners have a right to "exclude" others from their property is just another way of saying they have a right to decide whom to "include" (and for how long) by granting access. *See Union Carbide Corp. v. Alexander*, 679 S.W.2d 938, 940 (Tenn. 1984) (property ownership carries several fundamental rights and the corollary "right to refuse to do any of the[m]"). Indeed, the right to exclude is critical in large part because it facilitates an owner's ability to tap into the value of the property by selectively deciding which third parties to *include* on the property—often via a lease.

That is why property-law scholars have long recognized that the right to include and the right to exclude are joined at the hip. *See* Merrill, *supra*, at 742-43 ("[R]ight to exclude must encompass … the owner's right to include others."). So, too, has the Supreme Court. *See, e.g.*, *Dolan*, 512 U.S. at 394 (forcing an owner to cede a public easement would cause her to "lose all [her] rights to regulate the time in which the public entered"—*i.e.*, her right to include—while also "eviscerat[ing]"

[5] The law broadly protects corollary rights. *See, e.g.*, *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) ("corollary of the right to associate is the right not to associate"; both merit First Amendment protection); *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796-97 (1988) ("freedom of speech" "compris[es] the decision of both what to say and what *not* to say"); *Rock v. Arkansas*, 483 U.S. 44, 52-53 (1987) (Fifth Amendment protects the right to testify, "a necessary corollary" of the "Fifth Amendment's guarantee against compelled testimony"); *Faretta v. California*, 422 U.S. 806, 807 (1975) (Sixth Amendment's right to counsel also safeguards the right to conduct an uncounseled defense).

"[h]er right to exclude"). It follows that both rights merit the same constitutional protections and that both are violated by a law that dictates that a property owner can include tenants for a weekend only by sacrificing the right to exclude them for the remainder of the month. *See Horne v. USDA*, 576 U.S. 350, 365-66 (2015); *accord Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 439 n.17 (1982) ("[L]andlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation.").

Lafayette's Short-Term Rental Ordinance effects a *per se* taking of the right to include/exclude. By forbidding owners of properties zoned for single-family residences from welcoming paying guests who wish to stay only for short time periods, the City directly "interfere[s] with the owner's right" to include others on the property. *Sheetz*, 601 U.S. at 274. Plaintiffs' experiences illustrate the taking. Lafayette has forbidden Plaintiffs from including guests whom they wish to invite on their properties for a few days unless they give up their right to exclude such guests for the balance of the month—putting them to the choice of forgoing leasing altogether or welcoming those who wish to stay for longer than a month (to whom Plaintiffs would not otherwise lease). *See* ROA.26-30179.87-88.¶65; ROA.26-30179.89-90.¶69; ROA.26-30179.91.¶74; *Cienega Gardens v. United States*, 331 F.3d 1319, 1338 (Fed. Cir. 2003) (government violated the Takings Clause by compelling owners to rent only to low-rent housing participants to whom they would

not otherwise lease, which encroached on their right to exclude). That is precisely the kind of "intrusion on property rights [that] is a *per se* taking" and categorically requires payment of just compensation. *Sheetz*, 601 U.S. at 274.

3. The district court did not meaningfully engage with any of this analysis. Instead, it just embraced the City's position that no *per* se taking had occurred because "[t]he most elementary requirement" for a *per se* taking is supposedly "the occurrence of a physical appropriation," while also claiming that "[t]he question of whether a right is fundamental is irrelevant to the analysis." ROA.26-30179.683-84. Neither Lafayette nor the court below identified any authority for that absolutist limitation on the scope of the *per se* takings doctrine because it is fundamentally mistaken.

The Supreme Court has long held that *per se* takings occur with "direct government appropriation *or* physical invasion." *Lingle*, 544 U.S. at 537 (emphasis added). That is the core lesson of its nearly-40-year-old decision in *Hodel v. Irving*, 481 U.S. 704 (1987). In *Hodel*, a unanimous Supreme Court squarely held that a mandatory escheatment law, which destroyed property owners' ability to devise property to their chosen heirs, violated the Takings Clause. *See id.* at 716; *see* Eugene J. Morris, *New Developments in Federal Takings Law*, 7 Pace Envtl. L. Rev. 309, 310 (1990) (in *Hodel*, a "unanimous Court held that the escheat of a fragment of the total fee title to the property was a *per se* taking"). As the Court explained,

the mere fact that the government had "destroy[ed] 'one of the most essential sticks in the bundle of rights that are commonly characterized as property'"—the "right to pass on property," which has roots stretching back to "feudal times"—demonstrated that an uncompensated taking had occurred. *Id.* at 715-17; *see id.* at 717 ("a *total* abrogation of [such an essential] right[] cannot be upheld"). *Hodel* thus has been understood as recognizing a "per se" taking even absent "a physical invasion," Jed Rubenfeld, *Usings*, 102 Yale L.J. 1077, 1103 (1993), having explicitly held that the government can effect a taking just by abrogating a "valuable right" inhering in property ownership, like the right to "pass on valuable property to one's heirs," *Hodel*, 481 U.S. at 715-717. *See U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 n.16 (1977) (appropriation of "[c]ontract rights" can effect *per se* takings); *accord Alford*, 159 F.4th at 855.[6]

Nor does *Hodel* stand alone. Most recently, the Supreme Court in *Cedar Point* determined that the challenged access regulation effected a *per se* taking not simply because it involved a physical intrusion, but because the exclusion right "is *a 'fundamental element of the property right'* that cannot be balanced away." 594 U.S.

[6] While *Hodel* mentions *Penn Central* and is understood by some as a regulatory-takings case, it is widely considered an "example[]" of a *per se* takings case. E.M. Peñalver, *Is Land Special?*, 31 Ecology L.Q. 227, 229 n.9 (2004); *Cienega*, 331 F.3d at 1338. Regardless of the label, the key takeaway from *Hodel* is that the government effected a taking not via a physical occupation, but by "destroy[ing] 'one of the most essential sticks in the bundle of rights.'" 481 U.S. at 715-17.

at 158 (emphasis added) (citation omitted). Similarly, in *Curtin v. Benson*, the Supreme Court held that a federal regulation barring a property owner from grazing cattle on his property constituted a *per se* taking. 222 U.S. at 86. The Court recognized that the government's no-grazing order did not amount to a mere "regulation of the use of the land," but instead constituted "the prevention of a legal and essential use—an attribute of [property] ownership." *Id.* "To take [that right] away," the Court continued, is "to take his property away." *Id.*; *see also, e.g.*, *Armstrong v. United States*, 364 U.S. 40, 48-49 (1960) (government action preventing plaintiffs from suing to vindicate their rights in liens effected a categorical taking of intangible property).

Appellate decisions are in accord. The Eleventh Circuit's decision just last year in *Alford v. Walton County* is illustrative. There, the court applied *Cedar Point* to a COVID-era ordinance that barred landowners from accessing their own private beaches (*i.e.*, exercising a fundamental incident of property ownership) and found a *per se* taking based on the county's temporary appropriation of (among other rights) "the rights to possess" and "use." 159 F.4th at 854. *Alford* thus gives the lie to the suggestion below that, under current doctrine, *per se* takings cannot occur in the absence of "physical acquisition, appropriation, intrusion, or ouster." ROA.26-30179.683; *accord Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 51 n.26 (1st Cir. 2002) (en banc) (Selya, J., concurring) (explaining that *Ruckelshaus v. Monsanto Co.*, 467

U.S. 986 (1984), conducted "a per se takings analysis" despite the absence of physical intrusion, since the Supreme Court found a taking based solely on the fact that "the trade secret holder possessed a reasonable investment-backed expectation" that government would not publicly disclose its intangible "trade secrets"); *Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327, 1330 (9th Cir. 1977) (citing *Pumpelly v. Green Bay Co.*, 80 U.S. (13 Wall.) 166 (1871), and noting that "it is sufficient if the action by the government involves a direct interference with or disturbance of property rights").

The district court's understanding of *per se* takings is not merely wrong, however; it is a recipe for government overreach. If *per se* takings truly required a physical invasion, governments could categorically bar property owners from *ever* leasing their homes to *anyone* for *any* length of time without committing a *per se* taking. They could even issue a diktat that property owners must exclude *all* third parties—family, friends, and others—from their properties *forever*, as they technically would not have physically invaded the property in those situations. That physical-invasion-only theory of *per se* takings "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013).[7] A Takings Clause that protects

[7] Even assuming that physical interference is a prerequisite for *per se* takings claims, the district court never wrestled with the fact that the Short-Term Ordinance *has* a physical dimension: Lafayette bars short-term-rental guests from *physically* residing in homes in districts zoned for single-family residences.

only the hermit or those wealthy enough to have no need to unlock their property's value by selectively including others is an empty vessel. The far better view—supported by controlling precedent, history, and common sense—is that the Takings Clause protects the fundamental rights to lease and to include/exclude, no matter how long the owner allows his guest to remain on the property. *See supra* pp.25-33.

Perhaps recognizing that a physical-invasion-only understanding of *per se* takings is unsustainable, the district court also posited that "no fundamental rights are implicated" here. ROA.26-30179.683. That assertion fares no better. Indeed, the court arrived at that mistaken conclusion only by importing a *substantive-due-process* test into the takings context. *See infra* Part II. But whatever is true for purposes of mounting a substantive-due-process claim, there is no disputing that the rights to lease and to include/exclude are *fundamental property rights* protected by the *Takings Clause*. *E.g.*, *Civil Rights Cases*, 109 U.S. at 22 ("right to … lease" is "fundamental"); *accord Terrace*, 263 U.S. at 215; *see Ruckelshaus*, 467 U.S. at 999 (describing the exclusion right as the "fundamental right to exclude"); *Cedar Point*, 594 U.S. at 150; *Dolan*, 512 U.S. at 394 (applying *per se* analysis to government appropriation of an owner's inclusion right).[8] Because the City appropriated those

[8] For this reason, this Court's recent *due-process* analyses in *Hignell-Stark v. City of New Orleans*, 154 F.4th 345 (5th Cir. 2025), and *Marfil v. City of New Braunfels*, 2026 WL1755753 (5th Cir. June 18, 2026), have no bearing on the *takings* analysis here. In *Hignell-Stark*, the Court had no occasion to address any takings claim, and its analysis as to whether the plaintiffs there had identified a Due-Process-Clause-

rights through the Short-Term Rental Ordinance, it must pay just compensation. The district court erred in holding otherwise.

### B. The Ordinance's Prohibition on Short-Term Rentals Effects Regulatory Takings.

1. That the Short-Term Rental Ordinance effects a *per se* taking of Plaintiffs' fundamental property rights suffices to reverse the district court's order. In all events, it also effects a regulatory taking under *Penn Central*, which involves an ad hoc consideration of the law's economic impact, its interference with investment-backed expectations, and the character of the government action. *See Cedar Point*, 594 U.S. at 148.

Indeed, this is one of the rare cases where everyone agrees that *Penn Central*'s first two prongs—the two most important prongs, *see Lingle*, 544 U.S. at 538-40—are satisfied. *See* ROA.26-30179.741 (City arguing that the district court correctly

---

protected property interest considered only the effort of those plaintiffs to identify a property right in (relatively recent) state law. 154 F.4th at 353-54. So too in *Marfil*. *See* 2026 WL 1755753, at *2-5. To the extent that a due-process claim is procedural, current state law is an appropriate focus. But under the Takings Clause, state law "cannot be the only source" for identifying property interests; courts must "also look to 'traditional property law principles,' plus historical practice and [Supreme Court] precedents." *Tyler*, 598 U.S. at 638. To the extent that a due-process claim purports to be substantive, it would mean that the government could not take certain property even if it were willing to pay just compensation, which makes such a claim hard to square with the plain text of the Takings Clause (which says that the government can take property provided that it pays just compensation). Either way, a determination of what is property under the Due Process Clause cannot control the inquiry under the Takings Clause.

focused only on the third *Penn Central* prong). It is easy to see why. As Plaintiffs alleged, the Short-Term Rental Ordinance's economic burdens are palpable. Plaintiff Guidry's earnings have dropped from an average of $4,100 per month from her short-term renters to a maximum of $3,000 from long-term renters. *See* ROA.26-30179.90-91.¶¶72-73; ROA.26-30179.99.¶105. The over-$1,000 per month shortfall does not begin to capture the full economic loss, as Plaintiff Guidry has experienced much higher vacancy rates with long-term leases. *See* ROA.26-30179.99.¶105. That, of course, makes sense given that the universe of visitors to Lafayette is much larger than the universe of residents seeking to rent, rather than buy. In the same vein, Plaintiff DeSelle's forced switch to long-term rentals has caused him to lose over two-thirds of the income that he would otherwise have realized by offering short-term rentals. *See* ROA.26-30179.88-89.¶¶67-68; ROA.26-30179.99.¶105. Worse still, his property has lost significant value under the Ordinance, as no buyer will pay a price that reflects the short-term-rental-focused renovations that he made to the property. *See* ROA.26-30179.88.¶66; ROA.26-30179.89-90.¶69. The challenged regulations have effectively stranded that investment.

As the district court thus correctly concluded—and the City ultimately did not dispute, *see* ROA.26-30179.741—these tangible economic losses amply demonstrate the Ordinance's severe economic impacts. *See* ROA.26-30179.685.

Any other result would both run afoul of on-point precedent applying *Penn Central*'s first prong and improperly disregard Plaintiffs' well-pleaded allegations.[9] *See, e.g.*, *Heights Apartments v. Walz*, 30 F.4th 720, 734 (8th Cir. 2022) (allegations about lost rental income suffice to satisfy the economic-impact prong); *Dist. Intown Props. Ltd. P'ship v. District of Columbia*, 198 F.3d 874, 883 (D.C. Cir. 1999) (evidence that the challenged "regulation rendered [the property] unprofitable to maintain" would support finding a regulatory taking under the first *Penn Central* factor).

The Short-Term Rental Ordinance also interferes with Plaintiffs' investment-backed expectations, *see* ROA.26-30179.685-86, thus satisfying the second *Penn Central* prong as the district court found and the City ultimately did not contest, *see* ROA.26-30179.741. Before enacting the Ordinance, Lafayette had never restricted property owners' rights to lease and include/exclude others on a short-term basis. That decision "formed the basis of a reasonable investment-backed expectation." *Ruckelshaus*, 467 U.S. at 1011. Beyond Lafayette, Louisiana law in general has long protected property owners' right to lease, which encompasses their right to set its term, no matter how long. *See* La. Civ. Code Ann. art. 2678; *City Sav. Bank*, 127 So.

[9] To be sure, despite finding that Plaintiffs satisfied the economic-impact prong, the district court did not correct the R&R's mistaken determination not to credit the well-pleaded allegation that the Short-Term Rental Ordinance caused Plaintiff DeSelle's property value to decrease because Plaintiffs had not ruled out all possible alternatives. *See* ROA.26-30179.685. That determination is erroneous. *See, e.g.*, *Waller v. Hanlon*, 922 F.3d 590, 600 (5th Cir. 2019) ("allegations need 'not conclusively establish'" plaintiff's case).

at 891. And property owners have exercised those rights without interruption for centuries. *See supra* pp.5-9 & nn.1-2. Indeed, they continue to exercise that right in other parts of Lafayette. *See* Lafayette Code §73-3. Once again, the court below accepted that Plaintiffs had a reasonable basis for expecting that they could make significant investments in their properties aimed at offering short-term rentals and could continue offering such rentals in line with that historical tradition. *See* ROA.26-30179.98.¶103. As the Supreme Court has admonished, the City does not have "unfettered authority to 'shape and define property rights and reasonable investment-backed expectations,' leaving landowners without recourse against unreasonable regulations." *Murr v. Wisconsin*, 582 U.S. 383, 396 (2017).

The district court's acknowledgment that the first two *Penn Central* prongs are satisfied here (and the City's failure to dispute that determination) is no trivial matter. The Supreme Court has emphasized that the first two *Penn Central* factors are "[p]rimary" in the regulatory-takings analysis, such that "the *Penn Central* inquiry turns in large part" on them. *Lingle*, 544 U.S. at 538-40; *see Hawkeye Commodity Promotions v. Vilsack*, 486 F.3d 430, 441-42 (8th Cir. 2007). That the two "most important" factors are conceded here thus goes a long way toward proving a regulatory taking. *Colony Cove Props. v. City of Carson*, 888 F.3d 445, 454 n.9 (9th Cir. 2018).

In all events, it is equally clear that the third *Penn Central* factor—the character of the government action—also supports a finding that a taking has occurred. As other courts have explained, the third prong is satisfied when a law imposes "restrictions on property rights." *Heights*, 30 F.4th at 735. But the Short-Term Rental Ordinance does not merely restrict or regulate the exercise of property rights; it prohibits the exercise of an important incident of property ownership entirely. Thus, the character of the government action counsels strongly in favor of finding a taking. The entire point of *Penn Central* is to identify restrictions that go "too far" when it comes to property rights that are not treated as *per se* takings, in which any imposition, no matter how small or temporary, is automatically "too far." *See Cedar Point*, 594 U.S. at 149. When a restriction goes all the way to prohibit short-term rentals entirely, the government has clearly gone "too far." *Cf. Hodel*, 481 U.S. at 716-18 (*elimination* of the right to devise is a taking even if mere *restrictions* "adjust[ing] the rules governing" the right might not).

2. The district court nevertheless concluded that Plaintiffs had not plausibly alleged a regulatory taking based *solely* on its (mis)reading of the third *Penn Central* factor. *But cf. Lingle*, 544 U.S. at 539 (emphasizing the importance of the first two factors and noting only that the third factor "may be relevant" in the analysis as well); *accord Blakelick Props. v. Vill. of Glen Ellyn*, 2025 WL 3763905, at *3-4 (N.D. Ill. Dec. 30, 2025) (short-term-rental ban likely effected a regulatory

taking without addressing last factor). According to the court below, the Short-Term Rental Ordinance amounts to a mere "use restriction" on "commercial" properties, and "the public interest in preventing nuisances and protecting the residential character of neighborhoods is a legitimate purpose for which to regulate commercial activities in residential neighborhoods." ROA.26-30179.686-87; *see* ROA.26-30179.783-84. That reasoning is wrong at every turn.

As explained, *see supra* Section I.A, the Short-Term Rental Ordinance "directly appropriates" both the right to lease and the right to include/exclude, which are fundamental property rights. *See Lingle*, 544 U.S. at 539. *Cedar Point* makes clear that the "appropriation[] of" "a 'fundamental element of the property right'" is not a mere "use restriction[]." 594 U.S. at 158. Moreover, fundamental right or not, a complete prohibition on short-term rentals cannot be passed off as a mere "use restriction." Indeed, the third prong of *Penn Central* exists in part to distinguish mere limitations from the kind of complete prohibitions at issue here and in *Hodel* that plainly go "too far."

Nor are short-term rentals "commercial" in nature.[10] Just because short-term rentals yield revenue does not transform a residential property use into a commercial one. Lafayette recognizes as much. *See* Lafayette Code §73-7 (describing short-

[10] As noted, *Hignell-Stark*'s and *Marfil*'s due-process analyses neither govern nor foreclose this argument. *See supra* p.37.n.8.

term rentals as guests "utiliz[ing]" property for "residential occupancy"). So, too, have nearly 20 other jurisdictions. *See Pandharipande*, 679 S.W.3d at 627 (collecting cases); *Forshee v. Neuschwander*, 914 N.W.2d 643, 648 (Wis. 2018); *Pinehaven Plan. Bd. v. Brooks*, 70 P.3d 664, 668 (Idaho 2003). That is unsurprising. "If a vacation renter uses a home 'for the purposes of eating, sleeping, and other residential purposes,' this use is residential, not commercial, no matter how short the rental duration." *Wilkinson v. Chiwawa Cmtys. Ass'n*, 327 P.3d 614, 620 (Wash. 2014). That describes short-term rentals to a T. An owner's decision to stay for a few days at a time at a vacation home is a classic example of a residential use. Allowing guests to stay overnight in one's own home is too. Adding money to the equation—the only distinguishing factor for short-term rentals—"in no way detracts" from that reality, any more than selling a single-family residence or renting it for a month or year does so. *Lowden v. Bosley*, 909 A.2d 261, 267 (Md. 2006). No one has even suggested otherwise. The reality is no different when the owner leases the house for a shorter period and for less money.

The district court strayed even further in absolving the City of takings liability on the theory that the Ordinance advances "a legitimate [government] purpose." *See* ROA.26-30179.687. Even setting aside that the City amassed no evidence to support that theory, *see infra* Part II, takings law is premised on the notion that, even when governments pursue fully legitimate public purposes, they still must pay for what

they take. Considerations about whether a law is "unreasonable, arbitrary or [an] unequal exercise of power," ROA.26-30179.783 (quoting *Zahn v. Bd. of Pub. Works*, 274 U.S. 325, 328 (1927)), or "substantially advance[s] a legitimate government interest" are *due-process* inquiries—"not a valid takings test." *Lingle*, 544 U.S. at 548. Under the Takings Clause, the government must still provide just compensation even when it acts for the best of reasons. *See Cienega Gardens*, 331 F.3d at 1340.

Nor can the City avoid this result by insisting that it is facilitating neighbors' quiet enjoyment of their neighborhood. At the outset, that assertion is facially implausible since Lafayette already has generally applicable regulations aimed at abating nuisances, which do not ban the exercise of fundamental incidents of property ownership. *See* Lafayette Code §73-8 (requiring short-term rentals to abide by pre-existing nuisance regulations). Furthermore, bedrock takings principles foreclose government efforts to convert longstanding property uses into nuisances without providing just compensation—"property rights cannot be so easily manipulated." *Tyler*, 598 U.S. at 645.

Finally, that the district court's analysis of (and Lafayette's justification for) the Short-Term Rental Ordinance, *see* ROA.26-30179.741-42; ROA.26-30179.751-52, rested entirely on the purported benefits that will accrue to the public writ large only underscores the Takings Clause violation. *See* Ordinance No.CO-094-2023, *supra*, at 1 (claiming the Ordinance promotes public "health, safety and welfare");

Lafayette Code §73-1(b) (similar). The entire purpose of the Takings Clause is to "save[] individual property owners from bearing 'public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Sheetz*, 601 U.S. at 273-74. That Lafayette is concededly burdening a few private property owners to pursue public benefits makes the Takings Clause violation that much clearer. *Cienega Gardens*, 331 F.3d at 1340 (government's "*purpose* … may have been entirely legitimate but" "[t]he disproportionate imposition on the Owners of the public's burden" still constitutes a taking; a law "is not rendered any more acceptable [under the Takings Clause] by worthiness of purpose").

In sum, the district court's limited analysis does nothing to disturb the overwhelming evidence that the Short-Term Rental Ordinance effects a regulatory taking.[11]

## II. The Short-Term Rental Ordinance Violates The Equal Protection Clause.

The Short-Term Rental Ordinance's violation of the Equal Protection Clause is equally undeniable. There is no disputing that the Ordinance categorically prohibits homeowners from offering short-term rentals if their properties are in neighborhoods zoned for single-family residences, while simultaneously allowing

[11] In all events, if the Short-Term Rental Ordinance's severe restrictions on fundamental property rights somehow survived under *Penn Central*, that would underscore that the time has come for the Supreme Court to revisit the test. *See Murr*, 582 U.S. at 419 (Thomas, J., dissenting); *accord* ROA.26-30179.100.¶109; ROA.26-30179.64.n.8; ROA.26-30179.721.n.8.

homeowners in other zones to offer such rentals. *See* Lafayette Code §§73-3, 89-21 (Table 89-21-2 Use Table); ROA.26-30179.690-91. Nor is there any disputing that this discrimination "infringes [on] a constitutionally protected right"—namely, fundamental property rights protected by the Takings Clause, *see supra* pp.5-9, 25-33. *Soto-Lopez*, 476 U.S. at 904. Strict scrutiny therefore applies. *See Plyler v. Doe*, 457 U.S. 202, 216-17 & n.15 (1982). Neither Lafayette nor the district court ever suggested that the City can satisfy that exceedingly demanding test. That should be the end of the matter.

The district court disagreed only because (at the City's prodding) it applied rational-basis review and concluded that the Short-Term Rental Ordinance clears that hurdle. That watered-down analysis cannot save the Ordinance. At the "threshold," the court below agreed with the City that Plaintiffs failed to show that they are "similarly situated" to any comparator group. ROA.26-30179.690-91. But in the same breath, it acknowledged that "residential" properties outside Plaintiffs' zoning district are allowed to offer short-term rentals—precisely "the activity in which Plaintiffs wish to engage." ROA.26-30179.691. The court thus recognized the core similarity between Plaintiffs and other residential property owners. Nevertheless, it determined that Plaintiffs should have addressed (but failed to explain) the similarity between the *unregulated* characteristics of those properties. ROA.26-30179.691. But this Court has explicitly rejected that mode of analysis—

in the context of a recent challenge to other short-term rental restrictions, no less. As it stated, "the 'plaintiff's and comparators' relationships with the ordinance at issue" is the "relevant characteristic" for equal-protection purposes. *Hignell-Stark*, 154 F.4th at 354. Here, the fact that property owners in the two relevant groups seek to engage in the same residential activity means that they are similarly situated.[12]

The district court's other reasoning does not get the job done either. The court next insisted that Plaintiffs' equal-protection claim fails because the Short-Term Rental Ordinance does not "single[] out" Plaintiffs for unequal treatment, ostensibly because Lafayette has burdened all other homeowners in Plaintiffs' neighborhood. *See* ROA.26-30179.691. Of course, that ignores the Supreme Court's admonishment that "the number of individuals in a class is immaterial for equal protection analysis." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 n.* (2000). Contrary to the court's (mis)understanding, unconstitutional discrimination does not morph into legitimate discrimination just because the government dispenses it in bulk.

Switching gears, the district court claimed that "[t]here is no legal basis" for the argument that Lafayette has discriminated against Plaintiffs on the basis of

[12] The district court's equal-protection analysis again incorrectly asserts that short-term rentals are nothing more than "commercial activity." ROA.26-30179.690-91. To reiterate, the City's own Short-Term Rental Ordinance correctly describes short-term rentals as a form of "*residential* occupancy," Lafayette Code §73-7 (emphasis added), which is consistent with a long line of cases nationwide that similarly recognize that short-term guests use short-term rentals as temporary residential abodes, *see supra* pp.43-44.

fundamental property rights. ROA.26-30179.688-89. That too is wrong. The court conspicuously never disputed the historical record that Plaintiffs put forward that demonstrates that, since before the Founding, homeowners have exercised their rights to lease and to include others in their homes, including on short-term bases. *See supra* pp.5-9 & nn.1-2. Nor did the City offer a competing record of its own. That is significant, as this Court is "entitled to decide a case based on the historical record compiled by the parties." *Bruen*, 597 U.S. at 25 n.6.

The district court deemed irrelevant the unrebutted historical record confirming that this case involves fundamental property rights because those rights are supposedly not sufficiently fundamental to satisfy tests articulated in *substantive-due-process* cases. *See* ROA.26-30179.687-88. That is immaterial and drives home the point that the court below misunderstood the issues before it. As the Supreme Court has stated, for equal-protection purposes, "intensified equal protection scrutiny" applies "[w]henever a state law infringes a constitutionally protected right." *Soto-Lopez*, 476 U.S. at 904; *accord Plyler*, 457 U.S. at 217 n.15. As already explained, the rights to lease and include/exclude are indisputably constitutionally protected (by the Takings Clause), *see Cedar Point*, 594 U.S. at 150; *Alamo Land*, 424 U.S. at 303-04, and the Supreme Court has long deemed them "fundamental," *Kaiser Aetna v. United States*, 444 U.S. 164, 179-80 (1979); *Civil Rights Cases*, 109 U.S. at 22; *see also Dolan*, 512 U.S. at 394 (recognizing, *contra* ROA.26-30179.746,

that the Takings Clause protects the right to exclude and its corollary right to include).[13] There is accordingly no denying that Lafayette's interference with such constitutionally protected rights demands "intensified equal protection scrutiny." *Soto-Lopez*, 476 U.S. at 904. Whether that also triggers substantive-due-process protections—the inquiry conducted in *Hignell-Stark* and *Marfil*, *see supra* p.37.n.8—is an interesting, but ultimately academic, question here.

The district court thus plainly erred in applying rational-basis review to Lafayette's discriminatory treatment on the basis of constitutionally protected rights. But even accepting the erroneous premise that rational-basis review applies, the court below never explained how the Short-Term Rental Ordinance could satisfy that test. It noted only that "preventing nuisances and protecting the residential character of neighborhoods" are legitimate local interests and conclusorily asserted that the Ordinance furthers those goals. ROA.26-30179.689-90. That is insufficient. As this Court has instructed, rational-basis review does not "require courts to accept nonsensical explanations for regulation[s]." *St. Joseph Abbey v. Castille*, 712 F.3d

[13] The district court's suggestion that the Short-Term Rental Ordinance does not "entirely abrogate[]" the right to lease since long-term leasing is still an option, ROA.26-30179.689, is impossible to square with the fact that the defining feature of the right to lease is the power to define the lease's duration, *see supra* pp.26-27, 29-30. By taking that choice away from property owners, Lafayette has necessarily eviscerated his right to lease. Regardless, even partial takings trigger the Takings Clause's protections. *See Cedar Point*, 594 U.S. at 143, 152-53 (access regulation allowing union organizers to occupy private property "for up to three hours per day, 120 days per year" effected a taking).

215, 226 (5th Cir. 2013). Indeed, even a "perfectly rational statement of hypothesized footings for [a] challenged law" cannot carry the day if "it is betrayed by the undisputed facts." *Id.* at 223. That is precisely the case here. The City's suggestion that it must ban short-term rentals in single-family zones to prevent "nuisances" lacks *any* evidentiary support. In fact, the evidence that others have actually compiled suggests the exact opposite—that short-term guests are not associated with more nuisance-type behavior than non-paying short-term guests or long-term tenants. *See, e.g.*, *Zaatari v. City of Austin*, 615 S.W.3d 172, 189-90 (Tex. App. 2019) (short-term rentals had "significantly fewer 311" and "911 calls than other single-family properties"); ROA.26-30179.87-88.¶65, ROA.26-30179.91.¶74 (long-term tenants worse stewards of Plaintiffs' properties). Moreover, unlike short-term rentals, long-term rentals are certain to have a sustained impact on neighborhoods by virtue of their longer duration and guarantee of consistent usage. *See* Ngai Pindell, *Home Sweet Home?*, 29 St. Louis U. Pub. L. Rev. 41, 46-47 (2009).

The district court also defended the Short-Term Rental Ordinance's rationality on the ground that its restrictions are needed to "preserv[e] the residential character of [Lafayette's] neighborhoods." ROA.26-30179.690. That assertion is baffling. Lafayette itself concedes that short-term rentals *are* residential in character, and prohibiting *residential* uses in *residential* zones to protect *residential* character is the epitome of irrational government behavior. *See Allegheny Pittsburgh Coal Co. v.*

*Cnty. Comm'n*, 488 U.S. 336, 344 (1989) (government "may divide different kinds of property into classes" and regulate them differently only "so long as those divisions and burdens are reasonable"). To the extent that the City has concerns with noise, or traffic, or any other perceived problems, then the answer is to target noise, traffic, or those other problems directly, either through more stringent rules or better enforcement of existing rules. But when the government purports to address one problem by addressing an entirely different issue (and does so in a discriminatory fashion that denies valuable opportunities to some citizens that remain fully available to others), not even rational-basis review can save the government.[14]

In the end, the district court's reasoning amounted to little more than its reliance on the City's "negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985). Those are "not permissible bases" for disparate treatment, even under rational-basis review. *Id.*

---

[14] *Marfil* does not compel a contrary conclusion. Most obviously, no one disputed "that rational-basis review applie[d]," 2026 WL 1755753, at *6, so the Court never assessed the heightened-scrutiny argument that Plaintiffs press here. Furthermore, while this Court credited the residential-character and nuisance-abatement justifications for the challenged ordinance, *see id.* at *7-8, that reasoning is inapposite here, as Lafayette expressly deems short-term rentals a form of "*residential* occupancy." Lafayette Code §73-7 (emphasis added). And *Marfil* also never considered how the equal-protection analysis is impacted by a rule like Lafayette's that requires short-term rentals to comply with pre-existing, neutrally applicable nuisance rules. *See id.* §73-8.

## III. Plaintiffs DeSelle And Guidry Are Proper Parties To This Action.

The district court's determination that it had to dismiss Plaintiffs DeSelle and Guidry from this suit only adds to the errors committed below. To be sure, the court rightly did not inquire into their Article III standing. Everyone agrees here that Plaintiffs Stellarising, LLC, and EPH320, LLC, have Article III standing, and this Court "has repeatedly affirmed that once a court determines that at least one plaintiff has standing, it need not consider whether the remaining plaintiffs have standing to maintain the suit." ROA.26-30179.782; *see Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020); *accord Rumsfeld v. FAIR*, 547 U.S. 47, 53 n.2 (2006).[15] But the court deemed Plaintiffs DeSelle and Guidry improper parties anyway because their claims "stem from their respective membership interests," and "no relief can be granted on that basis." ROA.26-30179.783.

That reasoning is misguided. Because Plaintiffs DeSelle and Guidry pressed the *same* constitutional claims together with their respective LLCs and did not seek any distinct relief, *see supra* p.14.n.3, the district court's order is best understood as a dismissal under Federal Rule of Civil Procedure 17 on the grounds that the LLCs are the "real part[ies] in interest" here. But that overlooks that the LLCs "join[ed]"

[15] To be clear, Plaintiffs DeSelle and Guidry plainly have Article III standing. *See* ROA.26-30179.649; *Ensley v. Cody Res.*, 171 F.3d 315, 319-20 (5th Cir. 1999).

and "ratif[ied]" the arguments of their members (Plaintiffs DeSelle and Guidry) under Rule 17(a)(3). In such circumstances, both corporate and individual plaintiffs may remain in the litigation, *see, e.g.*, *Breaker v. United States*, 977 F.Supp.2d 921, 934 (D. Minn. 2013); Rule 17 "does not require that all other plaintiffs be dismissed" once a real party in interest is participating, *In re Nat'l Sugar Refin. Co.*, 23 B.R. 726, 728 (Bankr. S.D.N.Y. 1982). *See Advanced Magnetics v. Bayfront Partners*, 106 F.3d 11, 15, 21 (2d Cir. 1997) (reversing an order denying plaintiff's request to "add" the real parties in interest due to its incompatibility with Rule 17). There is thus no basis to eliminate Plaintiffs DeSelle and Guidry from this litigation.

* * *

In sum, Lafayette's effort to prohibit homeowners like Plaintiffs from exercising their fundamental rights to offer short-term rentals violates both the Takings and Equal Protection Clauses. The district court's decision is flawed from top to bottom. The fact that it viewed this case as a mere "policy" debate, instead of a dispute fit for "constitutional litigation," only underscores the error. ROA.26-30179.784. As the Supreme Court has emphasized, though a "controversy may, in a sense, be termed 'political,'" "[r]esolution of litigation challenging the constitutional authority of [government] … cannot be evaded by courts because the issues have political implications." *INS v. Chadha*, 462 U.S. 919, 942-43 (1983). "[T]he very enumeration of [constitutional] right[s] takes out of the hands of

government—even the Third Branch of Government—the power to decide … whether th[ose] right[s] [are] *really worth* insisting upon." *Bruen*, 597 U.S. at 23. This Court should reverse and reaffirm that Plaintiffs' constitutionally protected property and equal-protection rights are "*really worth* insisting upon."

## CONCLUSION

The Court should reverse the district court's order.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
*Counsel of Record*
ANDREW C. LAWRENCE
MITCHELL K. PALLAKI
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Plaintiffs-Appellants*

June 24, 2026

## CERTIFICATE OF SERVICE

I hereby certify that, on June 24, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF COMPLIANCE

I certify that:

1) This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32.2.

2) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

3) Any required privacy redactions have been made pursuant to Circuit Rule 25.2.13, the electronic submission is an exact copy of the paper submission, and the brief has been scanned for viruses using Windows Defender and is free of viruses.

June 24, 2026

s/Paul D. Clement
Paul D. Clement

# ADDENDUM

## TABLE OF CONTENTS

U.S. Const. amend. V ........ 1a

U.S. Const. amend. XIV ........ 2a

La. Civ. Code art. 2678 ........ 4a

Lafayette City-Parish Consol. Gov't, La., Code §73-1 ........ 5a

Lafayette City-Parish Consol. Gov't, La., Code §73-2 ........ 5a

Lafayette City-Parish Consol. Gov't, La., Code §73-3 ........ 5a

Lafayette City-Parish Consol. Gov't, La., Code §73-7 ........ 6a

Lafayette City-Parish Consol. Gov't, La., Code §73-8 ........ 7a

Lafayette City-Parish Consol. Gov't, La., Code §73-15 ........ 8a

Lafayette City-Parish Consol. Gov't, La., Code §89-21 (excerpts) ........ 9a

U.S.C.A. Const. Amend. V

Amendment V. Grand Jury Indictment for Capital Crimes; Double Jeopardy; Self-Incrimination; Due Process of Law; Takings without Just Compensation

Currentness

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

<Historical notes and references are included in the full text document for this amendment.>

<For Notes of Decisions, see separate documents for clauses of this amendment:>

<USCA Const. Amend. V--Grand Jury clause>

<USCA Const. Amend. V--Double Jeopardy clause>

<USCA Const. Amend. V--Self-Incrimination clause>

<USCA Const. Amend. V-- Due Process clause>

<USCA Const. Amend. V--Takings clause>

U.S.C.A. Const. Amend. V, USCA CONST Amend. V
Current through P.L. 119-81. Some statute sections may be more current, see credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Constitution of the United States
Annotated
Amendment XIV. Citizenship; Privileges and Immunities; Due Process; Equal Protection; Apportionment of Representation; Disqualification of Officers; Public Debt; Enforcement

U.S.C.A. Const. Amend. XIV

AMENDMENT XIV. CITIZENSHIP; PRIVILEGES AND IMMUNITIES; DUE PROCESS; EQUAL PROTECTION; APPOINTMENT OF REPRESENTATION; DISQUALIFICATION OF OFFICERS; PUBLIC DEBT; ENFORCEMENT

Currentness

**Section 1.** All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**Section 2.** Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

**Section 3.** No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

**Section 4.** The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

**Section 5.** The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

<Section 1 of this amendment is further displayed in separate documents according to subject matter,>

<see USCA Const Amend. XIV, § 1-Citizens>

<see USCA Const Amend. XIV, § 1-Privileges>


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

<see USCA Const Amend. XIV, § 1-Due Proc>

<see USCA Const Amend. XIV, § 1-Equal Protect>

<sections 2 to 5 of this amendment are displayed as separate documents,>

<see USCA Const Amend. XIV, § 2,>

<see USCA Const Amend. XIV, § 3,>

<see USCA Const Amend. XIV, § 4,>

<see USCA Const Amend. XIV, § 5,>

U.S.C.A. Const. Amend. XIV, USCA CONST Amend. XIV
Current through P.L. 119-81. Some statute sections may be more current, see credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

West's Louisiana Statutes Annotated
Louisiana Civil Code (Refs & Annos)
Book III. Of the Different Modes of Acquiring the Ownership of Things (Refs & Annos)
Title IX. Lease (Refs & Annos)
Chapter 2. Essential Elements (Refs & Annos)
Section 3. The Term

LSA-C.C. Art. 2678

Art. 2678. Term

Currentness

The lease shall be for a term. Its duration may be agreed to by the parties or supplied by law.

The term may be fixed or indeterminate. It is fixed when the parties agree that the lease will terminate at a designated date or upon the occurrence of a designated event.

It is indeterminate in all other cases.

**Credits**
Acts 2004, No. 821, § 1, eff. Jan. 1, 2005.

LSA-C.C. Art. 2678, LA C.C. Art. 2678
The Constitution, Revised Statutes, and the Codes are current through the 2025 Regular and First Extraordinary Sessions.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Sec. 73-1. Legislative intent and purpose.**

(a) The legislative intent and purpose in adopting this chapter is to promulgate reasonable rules and regulations for the licensing and lawful operation of a short-term rental, as defined herein, within the City of Lafayette.

(b) The Lafayette City Council finds that the establishment of rationally based, reasonably tailored rules and regulations as hereinafter set forth concerning short-term rentals is necessary to promote, protect and preserve the general welfare, safety, health, peace, good order and economy of Lafayette and the citizens of the City of Lafayette, and to preserve the integrity of Lafayette's neighborhoods.

(Ord. No. CO-094-2023, § 2, 10-3-23)

**Sec. 73-2. Territorial applicability and retroactivity.**

(a) Except as otherwise provided in this chapter, the provisions of this Chapter shall apply only in the City of Lafayette.

(b) In zoning districts wherein short-term rentals are a permitted use, this chapter shall not supersede or prevent any private conditions, covenants, or restrictions which prohibit same.

(c) This chapter applies to all short-term rentals located in the City of Lafayette regardless of whether the short-term rental existed prior to or subsequent to the adoption of this chapter.

(Ord. No. CO-094-2023, § 2, 10-3-23)

**Sec. 73-3. Limited operation in city of lafayette zoning districts.**

The operation of a short-term rental is only permitted in zoning districts which contain a "P*" in the short-term rental use category of Table 89-21-2 of the Lafayette Development Code. Within such zoning districts, the operation of a short-term rental is further restricted to being operated within one of the listed types of "Residences" under the use category of "Residential", and "Bed and Breakfast" listed under the use category of "Lodging", in Table 89-21-2 of the Lafayette Development Code that are permitted "by right" ("P") or by a valid Conditional Use Permit ("C"), in that zoning district. Notwithstanding the restrictions contained in the previous sentence, and only with regard to the "D" Downtown zoning district, a short-term rental may also be operated in single-

family detached dwellings or two-family dwellings (duplexes) which existed as of November 1, 2024.

Except in RS zoning districts, and notwithstanding the foregoing, any short-term rental being operated prior to the effective date of City Ordinance No. CO-094-2023 may qualify as a nonconformity under the provisions of Article 6 of Chapter 89 of the Lafayette City-Parish Consolidated Government Code of Ordinances if said short-term rental is being operated within one (1) of the listed types of "Residences" under the use category of "Residential", and "Bed and Breakfast" listed under the use category of "Lodging", in Table 89-21-2. In order to qualify as such nonconformity, in addition to the applicable provisions of Article 6 of Chapter 89 of the Lafayette City-Parish Consolidated Government Code of Ordinances, any person or entity currently operating a short-term rental shall, on or before January 31, 2025, apply for, obtain and maintain a valid short-term rental license in accordance with this chapter. Failure to timely apply for, obtain and maintain a valid short-term rental license shall result in the loss of the right to operate a short-term rental as a nonconformity. All other nonconformities shall be prohibited from converting to a short-term rental. In a RS zoning district, no short-term rental operating on or before October 6, 2023 shall qualify as a nonconformity, and this provision shall supersede Article 6 of Chapter 89 of the Lafayette City-Parish Consolidated Government Code of Ordinances.

(Ord. No. CO-094-2023, § 2, 10-3-23; Ord. No. CO-135-2024, § 2, 9-17-24; Ord. No. CO-182-2024, § 2, 11-18-24)

**Sec. 73-7. Definitions.**

The following words, terms and phrases, when used in this chapter, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

*Department* refers to the Lafayette City-Parish Consolidated Government, Department of Community Development and planning.

*Director* refers to the Director of the Lafayette City-Parish Consolidated Government, Department of Community Development and Planning or his/her designee.

*Dwelling* means a building, or individual units within a mixed-use building, designed for or used exclusively for residential purposes. A dwelling includes any use designated as "Residences" in the Use Table 89-21-2 of the Lafayette Development Code.

*Dwelling unit* means one or more rooms, including a bathroom and complete kitchen facilities, which are arranged, designed or used as living quarters for one family.

*Governing authority* refers to the governing authority of the City of Lafayette and/or the Lafayette City-Parish Consolidated Government.

*Licensee* means an operator that holds a current and valid license issued pursuant to this chapter.

*Operator* means a person, firm or corporation, including its agents and employees, which owns and/or operates a short-term rental in the City of Lafayette without a current and valid license issued pursuant to this chapter.

*Owner-occupied short-term rental* means a short-term rental with an owner/licensee who resides in said short-term rental as their primary residence.

*Short-term rental* means the provision of a dwelling or dwelling unit that offers one or more guest rooms, and that is suitable and utilized solely for temporary residential occupancy for a period of fewer than 30 consecutive days, in exchange for compensation.

*Short-term rental agent* means a natural person designated by the owner of a short-term rental on the short-term rental license application. A short-term rental owner who is a natural person may serve as the short-term rental agent.

*Short-term rental guests* mean guests, tourists, vacationers or any other person who, in exchange for compensation, occupy a short-term rental for a period of time not to exceed 29 consecutive days.

(Ord. No. CO-094-2023, § 2, 10-3-23)

**Sec. 73-8. Adherence to existing laws required.**

An operator/licensee of a short-term rental shall be subject to all federal, state, and local laws and regulations.

Without limiting the generality of the foregoing, the operation of a short-term rental shall not generate noise, vibration, glare, odors or other effects that unreasonably interfere or adversely affect another's use and enjoyment of property. To that end, all operators, licensees, and all persons who occupy a short-term rental, shall, in addition to the requirements contained herein, abide by all existing state and local laws and ordinances, including but not limited to Lafayette City-Parish Consolidated Government Code of Ordinances - Chapter 34, Article II "Nuisances," Lafayette City-Parish Consolidated Government Code of Ordinances

- Chapter 34, Article IV "Noise Control," Lafayette City-Parish Consolidated Government Code of Ordinances - Chapter 74, Article III "Solid Waste," Lafayette City-Parish Consolidated Government Code of Ordinances - Chapter 86, Article IX "Stopping, Standing, and Parking Regulations," said Chapters being incorporated herein by reference hereto.

(Ord. No. CO-094-2023, § 2, 10-3-23)

**Sec. 73-15. License required.**

It shall be unlawful to operate a short-term rental within the City of Lafayette without a valid and current Short-Term Rental license issued by the Lafayette City-Parish Consolidated Government. No license issued under this chapter shall operate as a valid license for the operation of a short-term rental for any person(s)/entity(ies) other than those listed on the license and for any location other than the specific location for which it is issued.

An operator/licensee is not entitled to and has no automatic right to a license. The issuance of a license may be withheld or denied in the discretion of the director, which decision may be based on the information in the application, as well as any records and/or operational history, of any nature whatsoever, available to the director.

(Ord. No. CO-094-2023, § 2, 10-3-23)

## 89-20 Annexed Territory

**(a) Generally**

**(1)** All territory that is annexed to the City of Lafayette is automatically assigned the "A" Agricultural classification until existing land uses are determined and a new zoning category is adopted.

**(2)** In lieu of the "A" district, the applicant for annexation may provide an application for rezoning concurrent with any petition for annexation. If the proper notice is given, the zoning classification may be approved concurrent with final approval of the annexation, or after the annexation is complete.

**(3) Time limitations**. Unless another district is applied at the time of annexation, the "A" district zoning classification will apply to that property until:

**a.** The LCG initiates and approves a rezoning to another zoning district as provided in Article 4.

**b.** The owner or owners of property automatically zoned "A" may file an application to rezone the property as provided in Article 4. The appropriate Zoning Commission will then proceed through normal zoning reclassification procedures.

**c.** Property automatically zoned "A" is considered on a priority basis and shall be scheduled at the earliest possible scheduled regular meeting of the appropriate Zoning Commission.

## 89-21 Use Table

**(a)** This section establishes the uses that are permitted in each zoning district. Each use is defined in subsection (d), below.

**(b)** The Use Table (Table 89-21-2) establishes the following categories of uses:

Table 89-21-1 Use Categories

| Notation | Category | Description |
|---|---|---|
| P | **By right** | The use is permitted if it meets the standards established in the zoning district, and any other applicable standards of this Chapter. |
| C | **Conditional Use** | The use requires a conditional use permit approved by the appropriate Zoning Commissions (see § 89-54). |
| A | **Accessory Use** | A use customarily incidental and subordinate to the principal use or building and located on the same lot with the principal use or building. |
| | **Not permitted** | A blank cell indicates that the use is not allowed in the district. A property owner who wants to establish the use may apply for a rezoning to a district that does allow the use. |

**(c)** If a use is not defined in this Section, the Administrator may authorize the use if –

**(1)** The use is functionally the same as a listed use, or

**(2)** The use has similar visual, traffic, environmental and similar impacts as an expressly listed use. The Administrator may refer to empirical studies or generally accepted planning or engineering sources in making this determination. The burden is on the applicant to establish that the use is similar to the expressly listed use, or

**(3)** Other comparably sized jurisdictions have successfully integrated the use in one or more equivalent zoning districts.

**(4)** The use is within the same industry classification as another permitted use. In making this determination, the Administrator may refer to the most recent edition of the *North American Industry Classification Manual* (Executive Office of the President, Office of Management and Budget, ("NAICS"). If the use is not defined in the NAICS, the Administrator may refer to the most recent addition of the American Planning Association, *Land-Based Classification Standards LBCS Tables*, or any other recognized and accepted publication in the industry.

*Table 89-21-2 Use Table*

| Use Category | "A" Agricultural | "RS" Residential Single-Family | "RM" Residential Mixed | "MN" Mixed-Use Neighborhood | "MX" Mixed-Use Center | "D" Downtown | "CM" Commercial Mixed | "CH" Commercial Heavy | "PI-L" Public/Institutional-Light | "PI-H" Public/Institutional-Heavy | "IL" Industrial Light | "IH" Industrial Heavy |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Residential** | | | | | | | | | | | | |
| ***Residences:*** | | | | | | | | | | | | |
| Dwelling, single-family detached | P | P | P | P | | | | | | | | |
| Accessory apartment | P | P | P | P | P | P | C | | | | | |
| Cottage Courts | | C | P | P | | C | P | | | | | |
| Dwelling, two-family (duplex) | | C | P | P | | | P | | | | | |
| Multi-family | | | P | P | P | P | P | P | | | | |
| Live/Work Dwelling | | | P | P | P | P | P | | | | | |
| Manufactured home | | | | | | | | | | | | |
| Manufactured Housing Land Lease Community | P | C | C | | | | | | | | | |
| Apartment House | | | P | P | P | P | P | | | | | |
| Apartment Hotel | | | | P | P | P | P | P | | | | |
| Townhouse / Row house | | C | P | P | P | P | P | | | | | |
| ***Group Living:*** | | | | | | | | | | | | |
| Boarding House | | | P | P | P | P | | | | | | |
| Community living | | | P | P | P | P | P | P | | | | |
| Community home | P | P | P | P | P | P | P | | | | P | |
| Life care or continuing care services | | | | P | P | P | P | P | | | | |
| **Lodging** | | | | | | | | | | | | |
| Bed and breakfast | | C | C | C | C | C | C | | | | | |

*Table 89-21-2 Use Table*

| Use Category | "A" Agricultural | "RS" Residential Single-Family | "RM" Residential Mixed | "MN" Mixed-Use Neighborhood | "MX" Mixed-Use Center | "D" Downtown | "CM" Commercial Mixed | "CH" Commercial Heavy | "PI-L" Public/Institutional-Light | "PI-H" Public/Institutional-Heavy | "IL" Industrial Light | "IH" Industrial Heavy |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Short-Term Rental *See LCG Code, Chapter 73-3 | P* | | P* | P* | P* | P* | P* | P* | | | P* | P* |
| Hotel (small) | | | | P | P | P | P | P | | | P | P |
| Hotel / Motel | | | | | P | P | P | P | | | P | P |
| Recreational vehicle park | C | | | | | | | | | | | |
| **Commercial / Mixed-Use** | | | | | | | | | | | | |
| ***Animal Services:*** | | | | | | | | | | | | |
| Animal hospital (indoor) | | | | P | P | P | P | P | | | P | P |
| Animal services, generally | | | | | | P | P | P | | | P | |
| ***Financial Services:*** | | | | | | | | | | | | |
| Automated teller machine, stand alone | | | | | P | P | P | P | P | P | P | P |
| Financial institutions | | | | P | P | P | P | P | A | A | P | P |
| ***Food & Beverage Sales / Service:*** | | | | | | | | | | | | |
| Bar / Lounge | | | | C | P | C | C | P | C | C | P | |
| Food/Art market | | | | P | P | P | P | P | A | A | | |
| Food preparation | | | | P | P | P | P | P | A | A | | |
| Food service | | | | C | P | P | P | P | A | A | | |
| Mobile Food Establishment | A | A | A | A | A | A | A | A | A | A | A | A |
| Mobile Food Establishment Park | | | | C | P | P | P | P | | | P | |
| Mobile vendor | | | | P | P | P | P | P | A | A | P | |
| Restaurant | | | | C | P | P | P | P | A | A | P | |
| Snack or beverage bars | | | | P | P | P | P | P | A | A | P | |
| ***Mixed-Use:*** | | | | | | | | | | | | |
| Mixed-use building | | | | P | P | P | P | P | A | P | | |
| ***Office, Business & Professional:*** | | | | | | | | | | | | |
| Office | | | | P | P | P | P | P | P | A | P | |
| ***Personal / Business services:*** | | | | | | | | | | | | |
| Bail bond services | | | | | | P | P | P | | | P | |
| Business support services | | | | | P | P | P | P | A | A | P | |
| Courier, messenger and delivery services | | | | | P | P | | P | A | A | P | P |
| Day Labor Service | | | | | | P | | P | | | P | P |
| Funeral & interment services | | | | | | P | P | P | | | P | |
| Crematorium | | | | | | | | P | | | P | P |
| Linen/Uniform Supply | | | | | | P | P | P | A | A | P | P |
| Maintenance & repair services | | | | | | P | P | P | | | P | P |
| Personal services | | | | P | P | P | P | P | A | A | | |

**(d)** The uses listed in the Use Table (Table 89-21) above are defined as follows:

| Residential | |
|---|---|
| ***Residences*** | |
| **Dwelling, single-family detached** | A detached building designed as a residence for one family. |
| **Accessory apartment** | A secondary, independent living facility located in, or on the same lot as, a single-family residence. An accessory apartment may be rented to a household separate from that occupying the principal building on the lot. |
| **Cottage Courts** | A single lot that includes detached single family dwellings or duplexes arranged around a courtyard or open space. |
| **Dwelling, two-family (duplex)** | A single building designed as a residence for two families living separately on one lot. The units may be integrated horizontally, vertically (with one above the other), or back to back. No more than one duplex shall be allowed on a single lot. |
| **Multi-family** | A building designed as a residence for more than two families living separately, sometimes called apartments or flats. It includes any form of family occupancy, including traditional or non-traditional households, elderly housing, or retirement housing. The units may be integrated horizontally and vertically, or with 2 units stacked vertically and separated from adjacent units by a party wall (sometimes called "stacked flats"). Two or more duplexes on a single lot shall be considered Multi-family. |
| **Live/Work Dwelling** | A principally residential building that includes an office, studio, or other commercial use and a single dwelling unit occupied by the building owner. Compare: (1) Home Occupations (listed under "Accessory," below). A live-work unit allows a broader range of commercial and production-type uses and more non-residential floor area than a home occupation. In addition, a live-work unit may be designed as a townhouse or with a storefront or other commercial design configuration at the ground level, while a home occupation occurs in a building that is designed as a residence. (2) Mixed-use Building (listed under Commercial / Mixed-use – Mixed-use, below). A Mixed-use Building allows multiple businesses and residences in the same building, while a Live/Work Dwelling is generally limited to a single dwelling unit and a single business. |
| **Manufactured home** | A factory-built dwelling unit constructed to the standards and codes promulgated by the United States Department of Housing and Urban Development (HUD), under the National Manufactured Housing Construction and Safety Standards Act of 1974, 42 U.S.C. §5401 et seq., as amended ((See LRSA 51:911.22). |
| **Manufactured Housing Land Lease Community** | A parcel or tract of land where the principal use is the rental, leasing or occupancy of space by two or more manufactured homes on a permanent or semi-permanent basis, and customary accessory buildings or uses such as clubhouses, laundries, or management and sales units. |
| **Apartment House** | A building that - (1) is a converted single-family detached dwelling, or with architectural features and massing that are compatible with single-family dwellings, and (2) that consists of at least 3 separate dwelling units. This use type is different from a boarding house in that the units are intended for occupancy as permanent residences, and each unit may have separate kitchens and bathroom facilities. This use type is sometimes called a "big house." |
| **Apartment Hotel** | A hotel in which at least 90 percent of the hotel accommodations are available for occupancy by permanent guests. |
| **Townhouse / Row house** | A single-family dwelling forming one of a group or series of two or more attached single-family dwellings, separated from one another by a property line, party walls without doors, windows, or other provisions for human passage or visibility through the walls from basement or cellar to roof, and having roofs which may extend from one of the dwelling units to another. |
| ***Group Living:*** | |
| **Boarding House** | A building other than a hotel where meals or lodging, or both, are provided for compensation by pre-arrangement for a definite period. Examples include dormitories, fraternities, sororities, or dorms. This use type does not include a hotel, motel, or multi-family building. A multifamily building or apartment house includes separate dwelling units occupied by a single household, while a boarding house includes separate households sharing kitchen facilities. |
| **Community living** | Establishments primarily engaged in providing one or more of the following housing services: (1) short term emergency shelter for victims of domestic violence, sexual assault, or child abuse; (2) temporary residential shelter for the homeless, runaway youths, and patients and families caught in medical crises; or (3) transitional housing for low-income individuals and families. *Note: while the industry (NAICS) category includes construction of low cost housing and housing repair activities, those features are not regulated by zoning, and the housing types would fall within another listed category.* |
| **Community home** | A facility certified, licensed, or monitored by the Department of Health and Hospitals to provide resident services and supervision to six or fewer handicapped persons. Such facility shall provide supervisory personnel in order to function as a single family unit but not to exceed two live-in persons. (Source: LRSA § 28:477) This use does not include persons handicapped by reason of current drug abuse or alcohol abuse, nor shall it apply to handicapped persons currently under sentence or on parole from any criminal violation or who have been found not guilty of a criminal charge by reason of insanity. |
| **Life care or continuing care services** | An institution, residence or facility that provides accommodation and personal assistance to residents who depend on the services of others by reason of age and physical or mental impairment, and that is licensed to provide skilled nursing care. This category includes nursing or convalescent homes, hospices, or assisted living facilities. A "nursing or convalescent home" is any part of a building where shelter, board, and nursing care for 3 or more persons of all ages not related to the operator, requiring that care because of infirmities of old age, illness, and/or disability of a physical or mental nature. "Assisted living" is a residence that primarily serves the elderly and provides rooms and meals, and may provide personal care and supervision of self-administered medication. They may provide other services, such as recreational activities, financial services and transportation. This use does not include an establishment which provides care only during the day, or a halfway house for recovering alcohol and drug abusers. |

| | |
|---|---|
| **Live/Work Dwelling** | A principally residential building that includes an office, studio, or other commercial use and a single dwelling unit occupied by the building owner. ~~6~~ Compare: (1) Home Occupations (listed under "Accessory," below). A live-work unit allows a broader range of commercial and production-type uses and more non-residential floor area than a home occupation. In addition, a live-work unit may be designed as a townhouse or with a storefront or other commercial design configuration at the ground level, while a home occupation occurs in a building that is designed as a residence. (2) Mixed-use Building (listed under Commercial / Mixed-Use – Mixed-Use, below). A Mixed-use Building allows multiple buildings and residences in the same building, while a Live/Work Dwelling is generally limited to a single dwelling unit and a single business. |
| **Lodging** | |
| **Bed and breakfast** | An owner- or operator-occupied house, or part of a house, that offers no more than 9 guest bedrooms for overnight paid occupancy of up to 30 consecutive nights, and where breakfast is provided to guests. |
| **Short-Term Rental** | The provision of a Dwelling or Dwelling Unit that offers one or more guest rooms, and that is suitable and utilized solely for temporary residential occupancy for a period of fewer than 30 consecutive days, in exchange for compensation. |
| **Hotel (small)** | A Hotel that does not contain more than 50 guest rooms and does not exceed three stories in height. |
| **Hotel / Motel** | A building containing rooms intended or designed to be used or which are used, rented, or hired out to be occupied, or which are occupied for sleeping purposes by guests and transients and where only a general kitchen and dining room are provided within the building or in an accessory building. |
| **Recreational vehicle park** | Any area that is occupied or intended or designed or improved for occupancy by transients using recreational vehicles, motor homes, or mobile trailers for dwelling, lodging, or sleeping purposes and is held out as such to the public. Examples include campgrounds and recreational vehicle/travel trailer parks. This use does not include a Manufactured Housing Land Lease Community. |
| **Commercial / Mixed-Use** | |
| ***Animal Services:*** | |
| **Animal hospital (indoor)** | Any part of a building designed or used to care for or observe animals under medical treatment, supervised by a licensed veterinarian. The treatment of animals occurs entirely inside the principal building and not in ancillary or accessory buildings. This use does not include outside kennels. |
| **Animal services, generally** | Any part of a building designed or used to care for, board, groom, observe, or treat animals, supervised by a licensed veterinarian. This use may include overnight boarding or outdoor confinement or exercise areas. Includes a dog pound. |
| ***Financial Services:*** | |
| **Automated teller machine, stand alone** | An automated teller machine that is at a location separate from the controlling financial institution. |
| **Financial institutions** | A business where the primary occupation is financial services such as banking, savings and loans, loan offices, and check cashing and currency exchange outlets. It does not include financial services that typically occur in an office or storefront, such as investment companies, loan companies, credit and mortgage, insurance services, or brokerage firms), which are classified under "Office," below. |
| **Pawn shop** | A business that loans money on the security of pledges, deposits or other secured transactions in personal property (other than vehicles or other transportation devices). |
| ***Food & Beverage Sales / Service:*** | |
| **Bar / Lounge** | An establishment where the main source of revenue is the sale of alcoholic beverages which are customarily consumed on the premises. This includes taverns, brewpubs, microbreweries, neighborhood taverns/bars/pubs, or micro distilleries where food and drink are served on the premises. |
| **Food/Art market** | A structure or place where agricultural produce, art or hand-made craft is brought for the purpose of retail sales from vehicles, temporary stands, or stalls. These include more than one seller per parcel of land. Examples include farmers markets, seafood markets, mobile markets, art markets, maker markets, and craft fairs. |
| **Food preparation** | A business that prepares food and beverages for off-site consumption, including delivery services. Examples include catering shops, bakeries with on-site retail sales, and the small-scale production of specialty foods (such as sweets). This classification excludes food production of an industrial character. |
| **Food service** | An establishment for retail sales of food and beverages for off-site preparation and consumption. Examples include grocers/supermarkets, specialty food stores, fruit and/or vegetable stands, butcher shops, delicatessens, dairy product sales, food cooperatives, or convenience markets. This category also includes large-scale stores that sell food items and beverages in bulk. |
| **Mobile Food Establishment** | A vehicle-mounted Food Establishment (as defined by LCG Code of Ordinances, Chapter 70, Section 70-86) designed to be readily movable which includes a motorized or towed self-contained food service operation truck or towed self-contained trailer unit designed to be readily movable. A Mobile Food Establishment shall not mean a stand, booth or cart. |
| **Mobile Food Establishment Park** | A lot of record which is occupied or intended or designed or improved for occupancy by not less than two nor more than ten Mobile Food Establishments for the purpose of offering food and/or drink for sale to the public as the principal use of the lot of record in compliance with §89-95-4. |
| **Mobile vendor** | Any person, including any employee or agent of another, who sells or offers to sell, barter or trade from a vending vehicle, trailer or cart. Mobile vendors do not include Mobile Food Establishments. |
| **Restaurant** | A structure where food and drink are prepared, served, and consumed. Examples include microbreweries, micro distilleries, sit-down restaurants, cafes, delis, ice cream parlors, specialty food and/or outside dining patios and sitting areas. May include take-out, drive-in, sit-down service, or the sale and consumption of alcohol. The zoning district regulations indicate whether a drive-thru facility for food service is allowed. |